PUERTO RICO HIGHER EDUCATION ASSISTANCE CORPORATION, Appellant,

v.

Richard W. RILEY, Secretary of the Department of Education, et al.

No. 92–5120.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 7, 1993.

Decided Dec. 10, 1993.

---

David D. Cole, Brooklyn, NY, argued the cause for appellant.

Shawn B. Jensen, Atty., U.S. Dept. of Justice, Washington, DC, argued the cause for the appellees. With him on the brief was Neil H. Koslowe, Sp. Litigation Counsel, U.S. Dept. of Justice, Washington, DC.

Before: MIKVA, Chief Judge, WALD and GINSBURG, Circuit Judges.

Opinion for the Court filed by Chief Judge MIKVA.

Opinion concurring in part and dissenting in part filed by Circuit Judge GINSBURG.

MIKVA, Chief Judge:

Pursuant to the 1987 amendments to the Higher Education Act of 1965, the Department of Education ("DOE" or "Department") recovered $4.397 million in excess cash reserves from the Puerto Rico Higher Education Assistance Corporation ("PRHEAC"). Pub.L. No. 100–203, 101 Stat. 1330 (codified at 20 U.S.C. § 1072(e) (1988)) (repealed 1989). PRHEAC asked the Department to waive recovery of these funds, but the Department deemed PRHEAC ineligible for a waiver. PRHEAC appealed, claiming that the Department's actions were arbitrary and capricious and that the 1987 amendments violated the Fifth and Fourteenth Amendments to the Constitution. The District Court granted the Department's motion for summary judgment and entered judgment as a matter of law. *Puerto Rico Higher Educ. Assistance Corp. v. Cavazos,* No. 89–3069, slip op. 1992 WL 41721 (D.D.C. January 27, 1992). We reverse.

We hold the Department's denial of PRHEAC's waiver application to be arbitrary and capricious under the Administrative Procedure Act, upon which this appeal is based, because it failed to address all of the factors upon which PRHEAC based its request. We remand to the Department of Education for reconsideration of PRHEAC's waiver application. In so doing, we express no view as to the propriety of granting or denying PRHEAC's application. We simply require that the Department, consistent with fundamental principles of administrative law, provide a reasoned basis for its actions. Because we dispose of this case on statutory grounds, we need not and do not reach PRHEAC's constitutional challenges to the 1987 amendments and their implementing regulations.

## I. BACKGROUND

The Higher Education Act of 1965 ("the Act") created the Guaranteed Student Loan ("GSL") Program, a comprehensive federal scheme for providing financial assistance to post-secondary students. Pub.L. No. 89–329, 79 Stat. 1236 (codified at 20 U.S.C. § 1071 *et seq.*). The Act authorizes the states to create student loan guaranty agencies to assist in the administration of the GSL program at the state level. PRHEAC is one such guaranty agency.

Pursuant to the Act and its implementing regulations, PRHEAC entered into a series of agreements with the Department relating to the administration of the GSL program in Puerto Rico. These agreements and the general relationship between PRHEAC and the Department were typical of the arrangements the Department had with other state guaranty agencies. In its "Reinsurance Agreement" and "Supplemental Reinsurance Agreement," PRHEAC agreed to guarantee repayment of qualifying student loans made by third-party lenders and the Department agreed to reimburse PRHEAC for a percentage of all such payments. PRHEAC also agreed to comply with all statutory and regulatory requirements of the GSL program and to "be bound by all changes in the Act or Regulations in accordance with their effective dates."

To discharge its financial obligations under the Act, PRHEAC maintained a "reserve fund" in which it deposited not only federal reimbursements and subsidies but also fees paid by third-party lenders, a specified percentage of post-default collections, earnings from the investment of reserve funds, and state appropriations, gifts, and grants. *See* 34 C.F.R. § 682.410(a)(1). Department regulations prohibited the use of reserve fund assets for purposes unrelated to GSL program operations. *See* 34 C.F.R. § 682.-410(a)(2).

In December 1987, Congress enacted the Omnibus Budget Reconciliation Act of 1987,

Pub.L. No. 100–203, 101 Stat. 1330 (codified at 20 U.S.C. § 1072(e) 1988) (repealed 1989) [hereinafter the "1987 amendments"], which amended the Act by, *inter alia,* setting a maximum limit on the amount of cash that guaranty agencies could keep in reserve. The 1987 amendments established a formula by which to calculate a state guaranty agency's maximum allowable cash reserves and directed the Department to recover "excess" reserve funds and deposit them in a federal student loan insurance fund. *See id.* The 1987 amendments authorized the Department to waive "recovery" of an agency's excess cash reserves if the Department determined, on application by an agency, that: (1) "a guaranty agency's financial position has deteriorated significantly"; (2) "significant changes in economic circumstances (such as a change in agency current cash reserves) or the loan insurance program render the limitations [on maximum cash reserves] inadequate for the continued functioning of the agency"; or (3) "a guaranty agency would be compelled to violate contractual obligations existing on December 22, 1987, that require a specified level of reserve funds to be maintained by such agency." 20 U.S.C. § 1072(e)(3)(A).

Pursuant to the 1987 amendments, the Department calculated PRHEAC's fiscal year 1986 excess cash reserves to be $4,397,090 and invited PRHEAC to elect the method by which it would transfer this excess to the Department. PRHEAC responded by requesting that the Department waive the recovery provisions due to the financial hardship that their application would impose on PRHEAC. In support of its waiver request, PRHEAC explained that its fiscal year 1986 "excess" cash reserves stemmed not only from moneys generated by program operations, but also from a $1 million independent capital contribution that PRHEAC had previously received from its parent corporation in 1981. Based on "key indicators" of GSL program profitability, PRHEAC claimed that, despite its appearance of fiscal health, it faced grave economic hardships.

Citing the substantial increase in PRHEAC's cash reserves between 1986 and 1987, the Department rejected PRHEAC's waiver request. The Department was aware that this increase principally derived from an additional $8 million capital contribution that PRHEAC received from its parent corporation in 1987. The Department informed PRHEAC that the amount of the excess reserves would be offset against DOE's future reimbursement payments until the $4,397,090 excess was paid off. The Department proceeded to implement this repayment method and recovered the entire $4,397,090 excess.

PRHEAC claims that the Department's denial of its waiver application was arbitrary and capricious in two respects. First, it claims that the Department based its decision on an impermissible factor—the independent capital contributions that PRHEAC received from its parent corporation. Second, PRHEAC claims that the Department failed to provide a reasoned basis for excluding from consideration many of the factors that PRHEAC advanced to support its waiver request.

## II. ANALYSIS

The scope of our review under the arbitrary and capricious standard of the Administrative Procedure Act is "narrow." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983). This court may not "substitute its judgment for that of the agency." *Id.* Nonetheless, we must ensure that the Department "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." *Id.* If the Department "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency" we would be compelled to find its decision arbitrary and capricious. *Id.* Moreover, this court may not supply a reasoned basis for the Department's decisions that the Department itself has not offered. *See SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947). We base our review of the Department's actions on the materials that were before the Department at the time

its decision was made. *See Walter O. Boswell Memorial Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C.Cir.1984).

### A. Independent Capital Contribution

Congress enacted the 1987 amendments to recover "excess cash reserves" from state guaranty agencies. H.R.Conf.Rep. 100–495, 100th Cong., 1st Sess. 518. Congress defined "excess cash reserves" as the greater of:

> (A) 40 percent of the total amount paid by that agency on insurance claims during the preceding fiscal year; (B) 0.3 percent of original principal amount of loans that are insured by that agency and that are outstanding at the end of such preceding fiscal year; (C) an amount which, when combined with all other parts of total agency reserves, equals 0.4 percent of such original principal amount; (D) $500,000; or (E) the amount required to comply with the reserve requirements of a State law as in effect on October 17, 1986.

20 U.S.C. § 1702(e)(1). Congress' definition thus did not distinguish between program-generated and other types of reserve fund assets.

■ Although PRHEAC argues that Congress meant to recover only those cash reserves generated by program operations, it is hard pressed to find a statutory basis for this claim. Principally, PRHEAC relies on the 1986 study that the General Accounting Office ("GAO") conducted of Guaranteed Student Loans. *See* General Accounting Office, Pub. No. GAO/HRD–86–57, GUARANTEED STUDENT LOANS: BETTER CRITERIA NEEDED FOR FINANCING GUARANTEE AGENCIES (1986) [hereinafter "REPORT"]. That study, which prompted the 1987 amendments, found, *inter alia*, that GSL agencies typically accumulated cash reserves in excess of those needed for effective program operations. It therefore recommended that Congress amend the Higher Education Act to limit the accumulation of excess cash reserves and thereby reduce federal GSL expenditures. *See* REPORT at 3–4. PRHEAC contends that this recommendation, which the 1987 amendments adopted, encompassed only program-generated reserves, not those attributable to independent sources. We disagree.

The GAO Report defined cash reserves as "the funds accumulated by an agency when its sources exceed its uses." REPORT at 14. The Report explicitly recognized that GSL program cash reserves derived from many sources, including state appropriations, yet it did not differentiate among those sources when framing its principal findings and recommendations. *Id.* at 22. The underlying purpose and plain language of the 1987 amendments thus suggest to this court that Congress intended all reserve fund assets, regardless of their source, to factor into the Department's calculations of excess cash reserves. Therefore, we are unpersuaded that the 1987 amendments were designed to recover only program-generated excess reserves while leaving other "excess" funds undisturbed.

■ PRHEAC also argues that its parent corporation's subsequent withdrawal of its independent capital contributions barred the Department from factoring those funds into the determination of PRHEAC's waiver eligibility. Again, we find no statutory authority to support PRHEAC's claim. We conclude that it was not arbitrary and capricious for the Department to consider PRHEAC's independent capital contributions when calculating PRHEAC's "excess" cash reserves or determining its waiver eligibility. It is elsewhere in the statute that the Department stumbled.

### B. Other Relevant Factors

PRHEAC's waiver application indicated that "[c]urrent developments in the local market, the structure of the portfolio being guaranteed, as well as the 1986 amendments to the law have created a precarious scenario for the agency." Specifically, PRHEAC indicated that the program's default rate had increased steadily since its inception in 1981. In addition, PRHEAC indicated that Puerto Rico's unemployment rate, personal disposable income rate, and labor force participation rate—all "key indicators" of future default rates—suggested a strong likelihood that PRHEAC's default rate would worsen over time. PRHEAC also noted that its "in-pro-

cess" default claims had more than doubled over the last year and had reached an all-time high. Moreover, PRHEAC had experienced a 35% decline in new guarantees compared to those it had issued to date one year earlier; it also faced increased reinsurance fee payments and decreased earnings from its average insurance premiums. Finally, PRHEAC informed the Department that it anticipated upgrading its physical plant and operating equipment sometime in the near future.

■ Although the Department assured PRHEAC that its waiver application met with "exhaustive review," its denial letter ignored many factors upon which PRHEAC's application was based. According to the Department, PRHEAC did not satisfy the first waiver criterion because its cash reserves had "dramatically increased" from $6,304,539 in fiscal year 1986 to $16,992,002 in fiscal year 1987. The Department thereby concluded that PRHEAC's financial position had not "deteriorated significantly." The Department also concluded that PRHEAC did not satisfy the second waiver criterion—a "significant change in economic circumstances"—because the increase in PRHEAC's total reserves from $8,194,322 in fiscal year 1986 to $18,499,051 in fiscal year 1987 and declining default rate over the same period outweighed the impact of PRHEAC's declining loan volume and Chase Manhattan Bank's withdrawal from PRHEAC's loan program. Finally, the Department explained that PRHEAC did not qualify for a waiver under the third statutory criterion because the Department's calculations showed that recovery of PRHEAC's excess cash reserves would not interfere with PRHEAC's contractual obligations regarding minimum cash reserves. Based on the foregoing analysis, the Department rejected PRHEAC's waiver application and commenced recovery of PRHEAC's $4,397,090 in excess cash reserves.

The Department's letter failed to address many of the factors upon which PRHEAC based its waiver application. The letter rejects, without explanation, PRHEAC's claim that its default rate had steadily increased. It ignores Puerto Rico's unemployment, disposable income, and workforce participation rates, which PRHEAC cited as "key indicators" of its future default rates. The denial letter also ignores PRHEAC's increased reinsurance payments and decreased earnings from insurance premiums for the coming year.

Nowhere in its denial letter did the Department articulate the statutory interpretation upon which its waiver determination was based. As such, this court does not know whether the Department considered but was unmoved by the "other relevant factors" upon which PRHEAC based its waiver application or whether the Department excluded those factors from consideration entirely. Assuming the former, the Department was legally obligated to explain the basis of its actions. See 5 U.S.C. § 706(2)(A). Assuming the latter, we do not know whether the Department thought itself statutorily precluded from considering these factors or whether it exercised its discretion not to consider them.

■ The Department's letter hardly exemplifies reasoned decisionmaking. It failed to address many of the factors upon which PRHEAC's waiver application was based and failed to explain the Department's reasons for ignoring them. Nonetheless, if the 1987 amendments had foreclosed consideration of the "other relevant factors" on which PRHEAC's waiver application was based, the Department's failure to address those factors would not justify a remand in this case. See Milk Transport, Inc. v. ICC, 190 F.Supp. 350 (D.Minn.1960), aff'd per curiam 368 U.S. 5, 82 S.Ct. 15, 7 L.Ed.2d 16 (1961). Employing traditional tools of statutory construction, we find it unreasonable to construe the 1987 amendments to preclude consideration of the factors supporting PRHEAC's waiver application.

The House Conference Committee Report on the 1987 amendments directed the Secretary of Education to "consider such factors as existing contractual obligations, composition of current and probable future student populations served by the guarantor, [and] changes in sources of funds which diminish the guaranty agency's ability to have sufficient resources to meet lender's claims"

when making waiver determinations. H.R.CONF.REP. 100–495, 100th Cong., 1st Sess. 518, *reprinted in* 1987 U.S.C.C.A.N. 2313–1, 2313–1264. The Report further provided that the Secretary "must assess whether reduction of cash reserves would materially affect the agencies' current and future ability to perform their vital role as guarantors of student loans." Finally, the Report conveyed the expectation that the Secretary would "broadly exercise the authority to waive the requirement in order to prevent damage to the functioning of the agency." Based on this legislative history, we find that it would be unreasonable to construe the 1987 amendments to preclude consideration of the factors PRHEAC presented to the Department in support of its waiver application.

On remand, the Department may exercise its discretion not to consider the "other relevant factors" PRHEAC advanced in support of its waiver application. The 1987 amendments clearly do not require their consideration. Nonetheless, the Department may not exercise its discretion indiscriminately. If the Department chooses to disregard PRHEAC's "other relevant factors" it must expressly indicate that it has done so. Otherwise, neither PRHEAC nor this court would be able to discern whether the Department considered and was unpersuaded by those factors or whether the Department simply excluded them from its decisionmaking process. Moreover, if the Department excludes those factors from consideration, it must explain its rationale for doing so. *See Int'l Ladies' Garment Union v. Donovan,* 722 F.2d 795, 815 n. 35 (D.C.Cir.1983).

### III. CONCLUSION

One of the fundamental principles of administrative law is that an agency's actions must be supported by reasoned decisionmaking. *See* 5 U.S.C. § 706(2)(A). That is clearly lacking in this case. In denying PRHEAC's waiver request, the Department failed to explicate both its interpretation of the statute and its reasons for excluding from consideration many of the factors PRHEAC advanced in support of its waiver application. We hold the Department's deci-

sion to be arbitrary and capricious. We reverse the summary judgment below and remand this case to the Department of Education so that it may provide a more thorough analysis of the merits of PRHEAC's waiver application. In so doing, we express no view as to the propriety of granting or denying PRHEAC's waiver request. We simply insist that the Department fulfill its legal obligation to justify and explain the basis for its actions.

*It is so ordered.*

GINSBURG, Circuit Judge, concurring in part and dissenting in part:

As the opinion for the court recounts, the Department of Education letter denying the PRHEAC's request for a waiver of the excess reserve recovery requirement does not clearly explain how or even whether the Department considered the "macroeconomic" data submitted by the PRHEAC. The Department stated only generally that it had considered the material offered by the PRHEAC in support of its waiver request, which implies that in the Department's view the statute either requires or allows it to consider such data. In its brief, however, the Department appears to have adopted a different position; it argues only that the statute does not require it to consider these macroeconomic factors, which implies that the Department could have but did not consider them. Finally, at oral argument, counsel for the Department stated flatly that when it denied the PRHEAC's request, the Department had interpreted the statute as precluding it from considering macroeconomic factors; this implies that, contrary to the representation in its letter, the Department did not in fact consider the macroeconomic data that the PRHEAC had submitted.

As the Department has successively unveiled its three different stories over the course of making and defending the decision under review, the statutory basis upon which it approached the PRHEAC's application and ultimately based its decision has become increasingly unclear. The court ought, therefore, to remand the case to the agency for a clear and complete explanation of how it

interprets the statute and of how it reached its decision.

The court, however, does nothing so modest as to require the Secretary to interpret and apply the statute he has been charged with administering. Instead, the court undertakes to interpret the statute for him—in the first instance. Thus, the court in its wisdom holds both that "the [statute does not] preclude consideration of the factors PRHEAC presented ... in support of its application" and that "[t]he [statute] clearly do[es] not require their consideration." Court Op. at 852–853. So the statute, per the court, authorizes but does not require the Secretary to consider macroeconomic factors.

Inasmuch as the Department's own interpretation of the statute is not apparent from the record before us, the court has no occasion, on its own initiative, preemptively to interpret the statute for the agency. Although the legislative history consulted by the court may be read to suggest that the agency should consider macroeconomic factors, the statute itself is not so clear that only one reading is possible. On the contrary, it seems to run in a considerably narrower channel, one in which "economic circumstances" refers only to matters endogenous to the program, and not to such exogenous matters as the economy of the Commonwealth. *See* 20 U.S.C. § 1072(e)(3)(A)(ii) (directing the agency to consider whether "significant changes in the economic circumstances (such as a change in agency current cash reserves) or the loan insurance program render" the maximum allowable amount of reserves "inadequate for the continued functioning of the agency.")

Where a statute that the agency has been entrusted to administer is ambiguous, it is the obligation and the province of the agency to interpret it in the first instance. Under *Chevron*, ambiguity functions as a delegation by the Congress to the agency, not to the court, to give the statute clearer definition. Our job is to assure only that the agency stays within the bounds of the "permissible." *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). By instead interpreting the stat-

ute in the first instance, the court generously usurps a power that the Congress delegated to the Executive.

The court can properly do nothing more today than to remand this case to the agency for a clear explanation of its interpretation of the statute it administers; if the case is again to come before us, we would then be able to review the Department's interpretation with the deference it is due under *Chevron*. Insofar as the court instead substitutes its judgment for that of the agency, I respectfully dissent.