Lloyd T. GRIFFIN, Jr., LTG Construction Co., Inc., Phoenix–Griffin Group II, Ltd, Gatsby Housing Associates, Inc., Plaintiffs,

v.

Robert REICH, Secretary of the United States Department of Labor, Maria Eschaveste, Individually and in her official capacity as Administrator of the Wage & Hour Division of the U.S. Department of Labor, Defendants.

Civil Action No. 95–054L.

United States District Court, D. Rhode Island.

Feb. 24, 1997.

**100**

Alden C. Harrington, Boyajian, Harrington & Richardson, Providence, RI, for Plaintiffs.

Everett C. Sammartino, United States Attorney's Office, Providence, RI, for Defendants.

*OPINION AND ORDER*

LAGUEUX, Chief Judge.

This case arises from the involvement of Lloyd T. Griffin, Jr., LTG Construction, Co., Inc., Phoenix–Griffin Group II, Ltd, and Gatsby Housing Associates, Inc. (collectively "plaintiffs") in the Turnkey Housing Project, a public housing development in Providence, Rhode Island funded by the United States Department of Housing and Urban Development ("HUD") under the Housing Act of 1937, 42 U.S.C. § 1437 (1994) *et seq.* After conducting an investigation into plaintiffs' activities at the Turnkey Project, the Wage and Hour Division of the United States Department of Labor found plaintiffs to be in willful violation of the Davis–Bacon and Related Acts ("DBRA") and ordered payment by plaintiffs of $460,000 in alleged unpaid wages to various workers on the Project and the debarment of plaintiffs from government contracts for three years. Both an Administrative Law Judge ("ALJ") and the Wage Appeals Board ("WAB") subsequently affirmed those orders.

This matter is before the Court on defendants' motion for summary judgment. In addition, plaintiffs seek judicial review of the WAB's decision pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 (1994) *et seq.*[1] This Court has the authority to review the WAB's decision pursuant to 5 U.S.C. § 704 (1994), as that decision constitutes final agency action by the Department of Labor. *See* 29 C.F.R. § 7.1(d) (1995). For the reasons that follow, defendants' motion for summary judgment is denied, plaintiffs' appeal is sustained, and the case is remanded to the Department of Labor for further consideration and fact finding.

**I. Facts**

The following facts are undisputed, except as noted. The Turnkey Housing Project is a public housing development in Providence, Rhode Island funded by HUD under the Housing Act of 1937, 42 U.S.C. § 1437 *et seq* (1994). In January of 1990, Phoenix–Griffin Group II, Ltd ("PGG") and the Providence Housing Authority ("PHA") entered into a contract under which PGG agreed to construct 92 units of scattered site, low-income housing for the Turnkey Project. PGG contracted with LTG Construction Co., Inc. ("LTG") to build the units, and LTG then contracted with Gatsby Housing Associates ("GHA") to clean the units before they were tendered to the Housing Authority. Plaintiff Lloyd T. Griffin is the president of PGG, LTG, and GHA.

Under the Housing Act of 1937, 42 U.S.C. § 1437 (1994) *et seq,* a Davis–Bacon Related Act, a contract for "loans, contributions, sale, or lease" of low-income housing, such as the one entered into by PHA and PGG, must:

> contain a provision that not less than the wages prevailing in the locality, as predetermined by the Secretary of Labor pursuant to the Davis–Bacon Act [40 U.S.C. § 276a et seq.], shall be paid to all laborers and mechanics *employed in the development of the project* ... (emphasis added).[2]

---

1. Plaintiffs also sought a temporary stay of agency action pending judicial review, which this Court granted on March 16, 1995.

2. The Davis–Bacon Act, 40 U.S.C. § 276a *et seq* (1994), provides, *inter alia,* that prevailing wage rates as determined by the Secretary of Labor must be paid to laborers and mechanics working under every construction contract involving in excess of $2,000 in which the United States is a party. Prevailing wage rates are those determined to be prevalent for similar jobs in the same locale.

42 U.S.C. § 1437j (1994). The Housing Act defines "development" as "any or all undertakings necessary for ... construction ... in connection with a low-income housing project." 42 U.S.C. § 1437a(c)(1) (1994).

HUD had the initial responsibility to ensure compliance with prevailing wage rules on the Turnkey Housing Project. *See* 29 C.F.R. § 5.6 (1995); Reorg. Plan No. 14 of 1950, *reprinted in* 5 U.S.C. app. at 1472 (1994).[3] In this capacity, HUD approved the contract between PHA and PGG as conforming to labor standards requirements.

Before PHA and PGG signed the contract, however, Griffin sought advice from HUD concerning whether work for the Turnkey Project to be performed at a location on Veazie Street in Providence would be subject to prevailing wage rates. LTG used the Veazie Street facility to construct sections of housing units. Those sections were then transported to the scattered sites for installation.

In response to Griffin's inquiry, the PHA investigated the matter. Stephen J. O'Rourke, Executive Director of the PHA, sent a letter to Casimir Kolaski, the manager of the HUD Providence Office, and Michael J. Dziok, the Director of Housing Management. In the letter, O'Rourke stated his view that work at the Veazie Street fabricating facility would not be subject to Davis–Bacon prevailing wage requirements and asked Kolaski and Dziok to "confirm [his] understanding." In reply, Dziok wrote on September 19, 1989:

> In response to your letter dated September 15, 1989, Davis Bacon Wage Rates do not apply to the fabrication of building components unless conducted in connection with and at the site of the project, or in a temporary plant set up elsewhere to supply the needs of the project and dedicated exclusively, or nearly so, to the performance of the contract or project.

There is some dispute concerning the extent of the knowledge these HUD officials possessed about the Turnkey Project at the time the letter was written.

The statement in Dziok's letter mirrors the standard articulated in *Federal Labor Standards Compliance in Housing and Community Development Programs Handbook* (the "HUD Handbook"), a book of guidelines published by HUD, which Griffin also consulted. The Handbook states, in pertinent part:

> The precutting of parts and/or the prefabrication of assemblies are not covered [i.e. subject to Davis–Bacon prevailing wage rates] unless conducted in connection with and at the site of the project, or in a temporary plant set up elsewhere to supply the needs of the project and dedicated exclusively, or nearly so, to performance of the contract or project.

HUD Handbook, 1344.1 Rev. 1 § 7.12 (1986).

PHA and PGG subsequently signed the contract, and plaintiffs did not pay prevailing wage rates to workers at the Veazie Street facility. In November of 1990, however, the Wage and Hour Division of the Department of Labor instituted an investigation into possible Davis–Bacon violations on the Turnkey Project. The Wage and Hour Administrator later concluded that there were several Davis–Bacon violations. Most significantly, the Administrator determined that plaintiffs should have paid prevailing wage rates at the Veazie Street facility. That matter accounts for approximately $250,000 of the approximately $300,000 in wages at issue in the present case, but the Administrator also concluded that prevailing wages were owed for work performed by working subcontractors and by cleaning personnel. The HUD Handbook also contains provisions pertaining to those two issues. *See* HUD Handbook,

**3.** 29 C.F.R. § 5.6 states, in pertinent part:

No payment, advance, grant, loan, or guarantee of funds shall be approved by the Federal agency unless the agency insures that the clauses [relating to Davis–Bacon requirements] and the appropriate wage determination of the Secretary of Labor are contained in such contracts ... The Federal agency shall cause such investigations to be made as may be necessary to assure compliance with the labor standards clauses required ...

Reorg. Plan No. 14 of 1950 requires that "the Secretary of Labor shall prescribe appropriate [labor] standards, regulations, and procedures, which shall be observed by ... agencies."

1344.1 Rev. 1 § 7.3, 7.4 (1986).[4]

In March of 1991, the Wage and Hour Division directed HUD to withhold $500,000 from the amounts to be paid to PGG upon completion of some housing units. At that time, plaintiffs had completed and conveyed title to fifty-two (52) units to PHA. Thirty-five (35) other units were nearly completed, and the development of the remaining five (5) units was in the beginning stages.

Plaintiffs filed a suit in United States District Court for the District of Rhode Island seeking to prevent the enforcement of the withholding order in April of 1991. *See Project B.A.S.I.C. v. Kemp,* 768 F.Supp. 21 (D.R.I.1991). In an effort to allow the project to continue, Judge Raymond J. Pettine of this Court ordered HUD to pay plaintiffs the $500,000 that had been previously withheld and later held HUD in contempt for failing to comply. However, the First Circuit reversed the contempt order, *Project B.A.S.I.C. v. Kemp,* 947 F.2d 11 (1st Cir. 1991), the money was not paid, and plaintiffs never resumed work on the Turnkey Project.

In addition, in August of 1991, the Wage and Hour Division issued findings of additional violations allegedly committed by plaintiffs and ordered plaintiffs' debarment from government contracts for three years.

Plaintiffs sought a hearing before an ALJ to challenge those findings. On July 1, 1993, after a 24–day hearing, the ALJ upheld the determinations of the Wage and Hour Division. The ALJ found that the Veazie Street facility was subject to Davis–Bacon prevailing wage rates for two reasons. First, the ALJ ruled that the Housing Act standard concerning "the development of the project" encompassed the work at the Veazie Street facility. Second, the ALJ held that the Veazie Street location fell within the regulatory definition of "site of work" at 29 C.F.R. § 5.2(*l* )(2) (1995) because "the products fabricated there were 'dedicated exclusively, or nearly so,' to performance of the contract or project and as the facility was located in proximity to the actual construction location that inclusion would be reasonable." [5] The ALJ also ruled that plaintiffs owed Davis–Bacon wages to all persons who worked at the scattered-site locations, whether they were subcontractors or employees of subcontractors. In addition, the ALJ decided that the cleaning work at issue was "construction" and was therefore subject to prevailing wage requirements. Finally, the ALJ, addressing twelve alleged infractions, found that plaintiffs had committed aggravated and willful violations of the DBRA and ordered their debarment from government contracts for three years.

In December of 1994, the WAB rendered a decision affirming the ALJ in every respect. The WAB held that the language of the Housing Act concerning "the development of the project" controlled the Veazie Street issue, holding that work at the off-site facility fell "within the plain meaning of the statute." The WAB did not rely on the ALJ's second rationale for finding the Veazie Street facility subject to prevailing wage requirements; the

---

4. HUD Handbook, 1344.1 Rev. 1 § 7.3 (1986) states, in pertinent part:

Any of [certain] criteria in conjunction with a signed contract containing HUD Federal Labor Standards Provisions from each such subcontractor should be sufficient to establish that he or she is a bona-fide subcontractor. Such a subcontractor will submit payrolls indicating only that he/she is the owner, the hours worked and the classification ... Nonbona-fide self employed subcontractors must be carried as employees on the payroll of the contractor who engaged him/her, and must be paid the prevailing wage rate for the classification of work performed.
HUD Handbook, 1344.1 Rev. 1 § 7.4 (1986) provides:
Cleaning performed during construction is subject to prevailing wage provisions. In the

absence of a specific wage rate for the cleaning classification, or if DOL disapproves a conformance request, the cleaners must be paid the predetermined wage rate for laborers. Cleaning performed after the completion of construction in order to prepare the premises for occupancy which is not being done under the construction contract is not subject to the prevailing wage requirements.

5. 29 C.F.R. § 5.2(*l* )(2) states, in pertinent part:

fabrication plants, mobile factories, batch plants, borrow pits, job headquarters, tool yards, etc., are part of the *site of the work,* provided they are dedicated exclusively, or nearly so, to performance of the contract or project, and are so located in proximity to the actual construction location that it would be reasonable to include them.

D.C.Circuit had recently held that the concept of "site of work" articulated in 29 C.F.R. § 5.2(*l*)(2) was inconsistent with the Davis–Bacon Act and was therefore invalid. *See Ball, Ball & Brosamer, Inc. v. Reich,* 24 F.3d 1447 (D.C.Cir.1994). In addition, the WAB upheld the order of debarment, although it only discussed three of the alleged violations detailed by the ALJ in his opinion.

In addition, both the ALJ and WAB rejected plaintiffs' assertion that the doctrine of equitable estoppel bars the Department of Labor from penalizing plaintiffs in these circumstances. The ALJ found that plaintiffs had not reasonably relied on HUD advice when making decisions concerning the Turn-key Project, a finding that the WAB did not find to be clearly erroneous.[6]

In support of their complaint, plaintiffs argue for "appropriate recognition" of the HUD Handbook. With respect to the Veazie Street issue, plaintiffs contend that there must be a limitation to Davis–Bacon application offsite, and the HUD Handbook articulates a wise exception to the broad standard set forth in the Housing Act. This is an exception, plaintiffs argue, that is obviously needed, especially since the interpretation of the site of work limitation embodied in 29 C.F.R. § 5.2(*l*)(2) was invalidated by the D.C.Circuit, and the Department of Labor has never officially communicated its position on this point. Plaintiffs concede, however, that regulations promulgated by the Department of Labor govern both the working subcontractor and cleaning issues despite the fact that published HUD policies conflict. Finally, plaintiffs argue that the WAB applied an incorrect legal standard when reviewing the ALJ's findings with respect to debarment. Plaintiffs maintain that the WAB should have reviewed "the totality of the circumstances," instead of merely mentioning three of the alleged violations that the ALJ addressed.

In contrast, the Department of Labor argues that its interpretations control the Veazie Street facility issue, as well as the subcontractor and cleaning issues. With respect to the Veazie Street facility, the Department of Labor argues that "it has always taken the position" that the Housing Act standard concerning "the development of the project" should be given a plain language interpretation. Therefore, the agency argues that plaintiffs should be found to be in violation of DBRA requirements on all three bases. In addition, defendants argue that the WAB affirmed the ALJ's findings concerning several "willful violations" committed by plaintiffs, and there was no need to review all twelve of the alleged violations discussed by the ALJ.

Plaintiffs also argue that even if their interpretation of the Housing Act is incorrect, the doctrine of equitable estoppel should be applied against the Department of Labor with respect to all three issues: (1) work performed at the Veazie Street facility; (2) work carried out by subcontractors; and (3) the execution of cleaning work at the scattered housing sites.

Plaintiffs contend that they reasonably relied on the advice they received from HUD before acting. With respect to the Veazie Street facility, plaintiffs emphasize that they received both written and oral advice specifically responding to their query. Plaintiffs also argue that the HUD Handbook sets forth longstanding HUD policy concerning working subcontractors and cleaning personnel, and they maintain that they complied with such policies at all times. In addition, plaintiffs emphasize that, pursuant to regulations promulgated by the Secretary of Labor, HUD is the agency that is responsible for the initial oversight of compliance with DBRA prevailing wage requirements. To this end, HUD must approve contracts covered by DBRA and continually monitor such projects.

In disputing plaintiffs' equitable estoppel argument, defendants contend that the Secretary of Labor is the ultimate authority for enforcement of Davis–Bacon provisions, *see* 42 U.S.C. § 1437j (1994); Reorg. Plan No. 14 of 1950, and plaintiffs were on legal notice that any questions should be directed to the Department of Labor. *See* 29 C.F.R. § 5.13 (1995). They also argue that Griffin had been investigated by the Department of La-

---

**6.** Further discussion of those decisions is included in part IV of this opinion.

bor prior to the present action and, therefore, knew that he should consult the Department of Labor. However, plaintiffs contend that HUD conducted that investigation. Finally, defendants argue that the doctrine of equitable estoppel is not applicable in this case.

In the present action, plaintiffs ask this Court to vacate all Department of Labor orders and require HUD to turn over previously withheld funds to plaintiffs. Plaintiffs also request costs, reasonable attorney's fees, and "any further relief the Court deems proper."

After hearing oral arguments, the Court took the matter under advisement. It is now in order for decision.

## II. Standard of Decision

This case is postured before the Court in two ways. First, defendants' motion for summary judgment must be considered. Rule 56(c) of the Federal Rules of Civil Procedure governs summary judgment motions:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

A dispute is only "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A "material" fact is one that "has the capacity to sway the outcome of the litigation under the applicable law." *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 2247, 132 L.Ed.2d 255 (1995).

When considering a motion for summary judgment, the Court must "view the record in the light most favorable to the party opposing the motion, accepting all reasonable inferences favoring that party." *Continental Cas. Co. v. Canadian Universal Ins. Co.*, 924 F.2d 370, 373 (1st Cir.1991).

## III. Standard of Review

Secondly, this case is an appeal under the APA, 5 U.S.C. § 701 *et seq.* (1994). This Court has the authority to review the WAB's decision pursuant to 5 U.S.C. § 704 (1994), since that decision constitutes final agency action by the Department of Labor. *See* 29 C.F.R. § 7.1(d) (1995).

Under the APA, this Court must "hold unlawful and set aside [the Department of Labor's] action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1994). *See also L.P. Cavett Co. v. United States Dep't of Labor*, 101 F.3d 1111, 1113 (6th Cir.1996) (applying arbitrary and capricious standard to decision of the Wage Appeals Board).

 This is a "highly deferential" standard, whereby the "court presumes the agency action to be valid." *See, e.g., Sierra Club v. Marsh*, 976 F.2d 763, 769 (1st Cir.1992); *Conservation Law Found. of New England, Inc. v. Secretary of the Interior*, 864 F.2d 954, 957–958 (1st Cir.1989). A reviewing court "cannot substitute its own judgment for that of the agency." *Conservation Law Found. of New England, Inc. v. Secretary of the Interior*, 864 F.2d at 958.

However, the appellate process is not merely a meaningless ritual. As one circuit court stated:

> If the Department 'relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency' we would be compelled to find its decision arbitrary and capricious.

*Puerto Rico Higher Educ. Assistance Corp. v. Riley*, 10 F.3d 847, 850 (D.C.Cir.1993) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–2867, 77 L.Ed.2d 443 (1983)).

 When reviewing an administrative decision, inquiry is confined to the administrative record, not a new record created by the reviewing court. *See Camp v. Pitts*, 411 U.S.

138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973); *Puerto Rico Higher Educ. Assistance Corp. v. Riley,* 10 F.3d at 850–851 (same).

## IV. Analysis

### A. Governing Labor Standards

Plaintiffs acknowledge that formal regulations promulgated by the Department of Labor concerning working subcontractors and cleaning work differ from HUD policies. For example, plaintiffs argue that, under HUD policy, working subcontractors do not have to be paid prevailing wage rates and need not be accounted for in the same manner as other workers on the payroll. *See* HUD Handbook, 1344.1 Rev. 1 § 7.3 (1986). However, 29 C.F.R. § 5.2(*o*) (1995) does not distinguish between subcontractors and other workers.[7] Similarly, policies of HUD and the Department of Labor concerning the payment of cleaning personnel conflict. *See In the Matter of Woodside Village,* WAB Case No. 75–13 (June 25, 1976) (holding that certain cleaning work constitutes "construction" that is subject to the DBRA). *But see* HUD Handbook, 1344.1 Rev. 1 § 7.4 (1986). Plaintiffs, however, acknowledge that the regulations of the Department of Labor with respect to these two issues are of a higher authority than the HUD Handbook.

■ However, plaintiffs argue that the HUD Handbook provision relating to the Veazie Street facility should be given legal weight since the Department of Labor has not issued formal regulations that contravene it. According to plaintiffs, the expansive interpretation of "the development of the project" which defendants posit is overbroad and unworkable. Moreover, plaintiffs contend that the HUD Handbook sets forth a valid exception to that broad standard, an exception that offers a principled way to delimit the scope of Davis–Bacon coverage under the Housing Act. Plaintiffs also emphasize that since the D.C. Circuit deemed 29 C.F.R. § 5.2(*l*)(2) (1995) to be in conflict with the Davis Bacon Act in *Ball, Ball & Brosamer,*

*Inc. v. Reich,* 24 F.3d 1447 (D.C.Cir.1994), there is no currently recognized way to define proper limitations to Davis–Bacon coverage offsite aside from the HUD Handbook.

■ The interpretations of an agency concerning statutes it administers are entitled to extreme deference. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under *Chevron,* a court may alter an agency interpretation only if it contravenes clear Congressional intent or, if the statute is "silent or ambiguous," and the interpretation is not "based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2782. In so holding, the Supreme Court emphasized its recognition of "the principle of deference to administrative interpretations'" *Id.* at 844, 104 S.Ct. at 2782, and noted that an agency's interpretation need not be "the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Id.* at n. 11. In the present case, both parties emphasize this point of law, although they argue it requires deference to HUD and the Department of Labor respectively.

This Court acknowledges the wisdom of defining the scope of the Housing Act with respect to Davis–Bacon coverage more narrowly than the Department of Labor suggests. Indeed, it seems clear, as a matter of policy, that there should be a way to limit application of the Davis–Bacon Act to offsite facilities. However, by statute, the Department of Labor is the final arbiter of the Housing Act's interpretation with respect to Davis–Bacon coverage. *See* Reorg.Plan No. 14 of 1950; 42 U.S.C. § 1437(j) (1994). The interpretation of the Department of Labor, which is based on the plain language of the Housing Act, does not contravene clear Congressional intent. Moreover, even if the statute were viewed as somehow unclear, such an interpretation is not "impermissible." Therefore, the interpretation set forth by the Department of Labor is the controlling one.

---

**7.** 29 C.F.R. § 5.2(*o*) states that any laborer or mechanic on a Davis–Bacon covered project "is *employed* regardless of any contractual relation-

ship alleged to exist between the contractor and such person."

## B. The Doctrine of Equitable Estoppel

The question remains, however, whether the doctrine of equitable estoppel should be utilized to bar the Department of Labor from penalizing plaintiffs on the facts of this case. Plaintiffs assert that the doctrine of equitable estoppel should be applied with respect to (1) work performed at the Veazie Street facility; (2) work carried out by subcontractors; and (3) cleaning work performed after the units were constructed.

 The doctrine of equitable estoppel "is applied by courts to preclude a litigant from asserting a claim or invoking a defense predicated upon his own wrongdoing." Note, *Equitable Estoppel of the Government*, 79 Colum.L.Rev. 551 (1979). However, it is well-settled that the doctrine will not be applied against the government as readily as it may be asserted against private individuals. *See, e.g., Office of Personnel Management v. Richmond*, 496 U.S. 414, 419, 110 S.Ct. 2465, 2468–2469, 110 L.Ed.2d 387 (1990). Indeed, whether equitable estoppel may be applied against the government at all has been a source of considerable disagreement.

The traditional hesitance about applying equitable estoppel against the government is based on several concerns. In *Falcone v. Pierce*, 864 F.2d 226, 228–229 (1st Cir.1988), the First Circuit noted that the doctrine poses a threat to both separation of powers principles and protection of the public fisc. Moreover, in *Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984), the Court noted that "[w]hen the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined." *Id.* at 60, 104 S.Ct. at 2224.

With these concerns in mind, the Supreme Court has emphasized that it has never upheld a decision of a Court of Appeals applying equitable estoppel against the government. *See Office of Personnel Management*, 496 U.S. at 422, 110 S.Ct. at 2470. However, in both *Heckler v. Community Health Services*, 467 U.S. at 60, 104 S.Ct. at 2224, and *Office of Personnel Management*, 496 U.S. at 423, 110 S.Ct. at 2470–2471, the Court ex-

pressly stated that it was leaving the issue of whether equitable estoppel may lie against the government as an open question. Indeed, the Court stated that its "own opinions have continued to mention the possibility, in the course of rejecting estoppel arguments, that some type of 'affirmative misconduct' might give rise to estoppel against the Government." *Id.* at 421, 110 S.Ct. at 2470. Moreover, the Court has stated that it "is hesitant" to say that there are no cases in which the interests weighing against estoppel "might be outweighed by the countervailing interest of citizens in some minimum standard of decency, honor, and reliability in their dealings with their Government." *Heckler v. Community Health Services* at 60–61, 104 S.Ct. at 2224.

 The holding in *Office of Personnel Management v. Richmond* leaves the legal landscape unchanged for the purposes of this case. In *Office of Personnel Management*, the Court held that equitable estoppel may not be applied against the government when it necessitates appropriations from the public fisc. However, that holding is inapposite in this context, which involves the government's discretionary authority to order money transferred from one group of individuals to another (i.e. from plaintiffs to certain workers), not from the government to a private entity. Therefore, application of the doctrine in the present case is not foreclosed.

There are Supreme Court cases decided on equitable grounds that involve facts similar to those of the case at bar. In *United States v. Pennsylvania Indus. Chem. Corp. ("PICCO")*, 411 U.S. 655, 93 S.Ct. 1804, 36 L.Ed.2d 567 (1973), the Court held that Picco was entitled to present, in defense of its actions, evidence that it was affirmatively misled by the longstanding interpretation of the responsible administrative agency into believing that a given law did not apply to it. In so holding, the Court expressly addressed the validity of the agency regulations which were relied upon by Picco:

[A]lthough the regulations did not of themselves purport to create or define the statutory offense in question, it is certainly true that their designed purpose was to

guide persons as to the meaning and requirements of the statute. Thus, to the extent that the regulations deprive Pecco of fair warning as to what conduct the Government intended to make criminal, we think there can be no doubt that traditional notions of fairness inherent in our system of criminal justice prevent the Government from proceeding with the prosecution.

*Id.* at 674, 93 S.Ct. at 1816–1817 (citations omitted). In addition, in *Moser v. United States,* 341 U.S. 41, 71 S.Ct. 553, 95 L.Ed. 729 (1951), the Court held that the naturalization of the petitioner should not be hindered merely because the petitioner signed papers that ordinarily would bar citizenship. The Court noted:

Petitioner had sought information and guidance from the highest authority to which he could turn, and was advised to [sign the form] ... [The] total setting understandably lulled *this* petitioner into misconception of the legal consequences of applying for exemption.

*Id.* at 46, 71 S.Ct. at 556. However, the Supreme Court did not use the term "equitable estoppel" in *PICCO* and *Moser,* and courts have differed as to whether those decisions rest on a recognition of equitable estoppel against the government. For example, in *Heckler v. Community Health Services,* the Court mentioned that these two cases "seem to rest on the premise that when the Government acts in misleading ways, it may not enforce the law if to do so would harm a private party as a result of governmental deception." 467 U.S. at n. 12, 104 S.Ct. at n. 12. *See also Howell v. F.D.I.C.,* 986 F.2d 569 (1st Cir.1993) (*PICCO* may be an exception to the general rule against estoppel of the government.) However, Chief Justice Rehnquist, dissenting in *Heckler v. Community Health Services,* expressed the view that the decisions were not "traditional equitable estoppel cases." *See* 467 U.S. at 68, 104 S.Ct. at 2228 (Rehnquist, J., concurring).

Courts in the First Circuit have recognized the Supreme Court's reluctance to apply equitable estoppel against the government, but have also acknowledged that Court's refusal to reject the doctrine outright. *See Apex Construction Co., Inc. v. United States,* 719 F.Supp. 1144, 1156 (D.Mass.1989) ("there have been cases—both before and after the Supreme Court's decision in *Heckler v. Community Health Services*—in which the Court of Appeals for the First Circuit has considered circumstances in which the government might be estopped").

■ When assessing the viability of an equitable estoppel defense, courts in the First Circuit examine whether there has been "reasonable reliance" on " 'affirmative misconduct' attributable to the sovereign." *See United States v. Ven–Fuel, Inc.* 758 F.2d 741, 761 (1st Cir.1985) (quoting *Akbarin v. Immigration and Naturalization Serv.,* 669 F.2d 839, 842 (1st Cir.1982) (stating that these are the "minimum" requirements for such a defense)). *See also United States v. Javier Angueira,* 951 F.2d 12, 16 (1st Cir. 1991) (articulating the same standard, but finding no reliance or affirmative misconduct on the facts of the case).[8] Other courts have also considered "the risk, through estoppel, that a government official will, in effect, waive congressionally enacted public policy." *See Citizens Sav. Bank v. Bell,* 605 F.Supp. 1033 (D.R.I.1985). *Cf. United States v. Arkwright,* 690 F.Supp. 1133, 1143 (D.N.H.1988) (stating that if Arkwright could establish the three common elements, then the court would have to weigh "Arkwright's right to equitable relief against the public interest in the outcome of the suit").

■ The standard for "affirmative misconduct" appears to be only moderately demanding. In an effort to define what constitutes "affirmative misconduct," the First Circuit in *Akbarin v. Immigration and Naturalization Serv.* set forth a two-part test: "(1) was the government's action error, and (2) did the government's misconduct induce the petitioner to act in a way he or she

---

**8.** Plaintiffs have cited to a different three-part test. However, that test is merely a suggested approach in a law review note, *see* Note, *Equitable Estoppel of the Government,* 79 *Colum.L.Rev.* 550, 558 (1979), not the approach repeatedly applied by the First Circuit in the aftermath of *Heckler v. Community Health Services.*

would not otherwise have acted." *United States v. Ortiz–Perez*, 858 F.Supp. 11, 12–13 (D.R.I.1994), *aff'd* 66 F.3d 307 (1st Cir.1995) (citing *Akbarin v. Immigration and Naturalization Serv.*, 669 F.2d at 843.) It is clear that "mere inaction, delay or sloth on the part of the government" will not trigger the application of estoppel. *See Newport Nat'l Bank v. United States*, 556 F.Supp. 94, 98 (D.R.I.1983).

■ Both the ALJ and the WAB rejected plaintiffs' reliance on the doctrine of equitable estoppel as a matter of law. The ALJ wrote:

> I accept the [Government's] position that the estoppel doctrine does not apply against the [Government] based on well-settled legal principles that laches or neglect of duty by federal officers or employees is no defense to an action to enforce the public interest embodied in federal statutes. Moreover, mistakes of one agency cannot estop another from enforcing the law. (citations omitted).

In affirming this aspect of the ALJ's opinion, the WAB accepted the proposition that "the mistakes of one agency cannot be used to estop another." Moreover, the WAB reasoned that equitable estoppel would otherwise still not be applicable in the present case:

> To invoke estoppel against DOL to defeat a legitimate claim for back wages on behalf of aggrieved workers may be a legal impossibility (*see Heckler v. Community Health Services of Crawford County, Inc.*, 457 [467] U.S. 51 [104 S.Ct. 2218, 81 L.Ed.2d 42] (1984)), but even if it were not, it would require at a minimum a compelling demonstration of conscious and aggravated misconduct on the part of DOL.

As a result of this reasoning, the WAB did not fully assess whether the actions of *HUD* could constitute "affirmative misconduct" for purposes of an equitable estoppel defense.

This writer disagrees with the above assertions made by the ALJ and WAB. As a preliminary matter, it is not "well-settled" that the mistakes of one agency may never estop another agency. *Cf. PICCO*, 411 U.S. 655, 93 S.Ct. 1804, 36 L.Ed.2d 567 (holding

that evidence that agency interpretation of statute misled defendant should have been allowed in criminal prosecution by United States government). Moreover, the only cases cited by the ALJ and the WAB for this proposition are markedly different from the case at bar. For example, in *United States v. Stewart*, 311 U.S. 60, 61 S.Ct. 102, 85 L.Ed. 40 (1940), the Court held that statements in farm circulars distributed by the Farm Loan Board stating that certain bonds were tax-free would not bar the taxation of such bonds. Holding that the actions of the Farm Loan Board could not estop the IRS, the Court expressly relied on the fact that "[t]here was no authority for the board to make representations that capital gains were or were not tax exempt." *Id.* at 70, 61 S.Ct. at 108–109. Similarly, in *Graff v. Comm'r of Internal Revenue*, 673 F.2d 784 (5th Cir. 1982), the only other case cited by the ALJ and the WAB for this proposition, the Court held that statements by HUD concerning tax law did not bind the Commissioner of the Internal Revenue, because the HUD officials "had neither statutory responsibility nor expertise." *Id.* at 786. In contrast, in the present case, the regulatory and statutory scheme expressly contemplates that HUD, the contracting agency, has authority to monitor compliance with labor standards provisions. Indeed, HUD signed the contract between PHA and PGG and was responsible for the continued supervision of the Turnkey Project. In short, this Court opines that if ever there was a case where equitable estoppel should explicitly apply against the government, this is it, provided the factual predicates are found to exist.

■ After rejecting plaintiffs' equitable estoppel claim as a matter of law, the ALJ also stated that plaintiffs did not rely on HUD's advice, and the WAB found that this conclusion was not clearly erroneous. However, this Court concludes that the reliance issue was inadequately considered, and the finding was not based on articulated substantial evidence. The primary basis for the ALJ's decision was his view that, legally, equitable estoppel could not lie against the Department of Labor in this case. The ALJ only cursorily mentioned the issue of reliance:

Mr. Griffin and his affiliated firms did not reasonably rely upon and/or did not change position due to the conduct of HUD officials as LTG had initially prepared budget estimates based on the assumption that Veazie Street was DBRA-exempt. It is obvious that the project was seriously underbid and that, after PHA added additional requirements for each unit, various 'loopholes' were discovered and Respondents thereafter took advantage of the provisions relating to subcontractors, independent contractors and the cleaning issue.

However, the ALJ never explains why it is "obvious," that the project was underbid nor does he refute evidence in the record explaining that Griffin would not have participated in the project or would have handled labor matters differently if HUD's advice had been different. Indeed, in *Project B.A.S.I.C. v. Kemp,* Judge Pettine found that PPG had "relied upon HUD's assurance (through the PHA) that the wage law did not apply to the Veazie Street site." 768 F.Supp. at 25.[9] In addition, the ALJ failed to consider the three issues with respect to which plaintiffs assert the doctrine of equitable estoppel as separate matters involving different factual foundations.

The WAB decided that this conclusion was not clearly erroneous, noting that its own decisions state that reliance on a contracting agency's advice is misplaced. However, in its recitation of the background of the case, the WAB expressly stated:

> Petitioners believed that the wages paid at the Veazie Street site were exempt from the prevailing wage requirements of the Housing Act. Mr. Griffin based this belief on a written opinion and a handbook that he had received from PHA and HUD, the governmental entities responsible for administering this project.

This Court concludes that the ALJ's determination concerning reliance was conclusory, at best, and not entitled to deference on appeal. At the very least, the ALJ should have made specific findings concerning reliance with respect to all three issues as to

which plaintiffs assert equitable estoppel. Therefore, the ALJ's and WAB's conclusions concerning reliance pose no obstacle at this juncture to the application of the doctrine of equitable estoppel in this case.

It is evident that this case must be remanded to the Department of Labor in order for factual determinations to be made concerning the application of equitable estoppel with respect to all three issues herein addressed. The Department of Labor's inquiry should focus first on whether plaintiffs reasonably relied on affirmative representations by HUD.

Secondly, the Department of Labor should determine whether plaintiffs, in fact, complied with HUD's policies. Of course, if plaintiffs failed to do so, the doctrine has no application. With respect to the Veazie Street matter, the ALJ's findings were based, in part, on the standard articulated in 29 C.F.R. § 5.2($l$)(2), which has since been invalidated. Moreover, the ALJ repeatedly stated that the *products* produced at the Veazie Street facility were dedicated to the Turnkey Project, but the relevant standard concerns whether the *facility* was dedicated exclusively to the project. In addition, the ALJ did not fully inquire as to whether the Veazie Street facility was permanent or temporary, as the HUD Handbook required.

This Court is mindful of the Supreme Court's extreme reluctance to recognize equitable estoppel against the government. However, the DBRA's dual system of administration has created an extremely unusual, and apparently unjust, situation in this case. The result has been a bureaucratic whipsaw of plaintiffs. *See diStefano v. United States Dep't of the Treasury of Thrift Supervision,* 787 F.Supp. 292 (D.R.I.1992). To right this wrong, equitable estoppel should apply in this case if plaintiffs relied on HUD's written and/or oral representations and plaintiffs were in compliance with HUD's policies and representations concerning the applicability of Davis–Bacon requirements. Therefore, plaintiffs are entitled to a full inquiry into, and reconsideration of, all predicate facts

**9.** The First Circuit's decision reversing Judge Pettine's contempt order did not overrule this

finding. 947 F.2d 11 (1st Cir.1991).

which can form the basis for the application of equitable estoppel in this matter.

## C. Debarment

■ 29 C.F.R. § 5.12(a)(1) authorizes the debarment of a contractor from government contracts if such contractor is found "to be in aggravated or willful violation" of the DBRA.[10]

Affirming the Wage and Hour Division's order for plaintiffs' debarment, the ALJ concluded that plaintiffs had engaged in a "pattern of activity to evade the DBRA by various schemes." The ALJ stated:

> I have reluctantly come to the conclusion that the Turnkey Housing Project, somehow and/or for whatever reason, was seriously underbid, that when all of the figures for each section of the unit were factored into the total cost of each unit attempts were made to lower the construction cost of each unit by taking advantage of the "loopholes" in the contract relating to the use of independent contractors, subcontractors, owner-operators, an off-site fabrication facility and the use of another firm to clean the unit just prior to occupancy.

While conducting review, the WAB gave short shrift to this important matter. The WAB merely addressed three of the issues discussed by the ALJ. Those issues involved the designation and payment of certain workers as subcontractors, the compiling of payroll records relating to subcontractors, and the allegation that LTG told subcontractors that records could be falsified. The WAB mentioned neither the ALJ's finding concerning plaintiffs' alleged "pattern of activity to evade the DBRA" nor the ALJ's conclusion that the project was seriously underbid.

The opinions of the ALJ and WAB are general and conclusory with respect to the debarment issue. Moreover, the ALJ expressly stated that the violations relating to the Veazie Street facility, subcontractors, and cleaning personnel impacted his decision to affirm plaintiffs' debarment. Further inquiry concerning the doctrine of equitable estoppel may influence any determination as to whether plaintiffs' violations were "aggravated or willful."

It should be obvious by now that summary affirmance cannot be mandated in this case, thus, defendants' motion for summary judgment is denied. At this juncture, plaintiffs' appeal must be sustained and the case remanded to the Department of Labor for further consideration.

## IV. Conclusion

For the foregoing reasons, defendants' motion for summary judgment is denied. Plaintiffs' appeal is sustained, and the case is remanded to the Department of Labor for further consideration in accordance with the legal principles articulated in this Opinion. This Court retains jurisdiction of this matter, and the stay of debarment previously entered shall remain in full force and effect until further order of this Court.

It is so ordered.

10. § 5.12(a)(1) states:

Whenever any contractor or subcontractor is found by the Secretary of Labor to be in aggravated or willful violation of the labor standards provisions of any of the applicable statutes listed in § 5.1 other than the Davis–Bacon Act, such contractor or subcontractor or any firm, corporation, partnership, or association in which such contractor or subcontractor has a substantial interest shall be ineligible for a period not to exceed 3 years ... to receive any contract or subcontracts subject to any of the statutes listed in § 5.1.