**CONSERVATION LAW FOUNDATION OF NEW ENGLAND, INC.,** Plaintiff, Appellant,

v.

**SECRETARY OF THE INTERIOR, et al., Defendants, Appellees.**

No. 88–1720.

United States Court of Appeals, First Circuit.

Heard Nov. 2, 1988.

Decided Jan. 5, 1989.

---

Douglas I. Foy, Boston, Mass., with whom Stephen H. Burrington, was on brief, for plaintiff, appellant.

Martin J. Suuberg, Washington, D.C., with whom Frank L. McNamara, Jr., U.S. Atty., Martha B. Sosman, Asst. U.S. Atty., Boston, Mass., and Robin Lepore, Office of the Regional Solicitor, Northeast Region, Dept. of the Interior, Newton, Mass., were on brief, for defendants, appellees.

Before BOWNES and BREYER, Circuit Judges, and CAFFREY,* Senior District Judge.

CAFFREY, Senior District Judge.

The Conservation Law Foundation of New England, Inc. ("CLF") appeals from the district court's ruling upholding the validity of the National Park Service's 1985 Management Plan ("the 1985 Plan"). The 1985 Plan allows for the restricted use of

* Of the District of Massachusetts, sitting by desig-    nation.

off-road vehicles ("ORVs")[1] on the Cape Cod National Seashore ("the Seashore"). CLF contends that ORV use under the 1985 Plan violates the Cape Cod National Seashore Act, 16 U.S.C. §§ 459b *et seq.*, and Executive Order 11644, which deals with ORV use on public lands. We affirm the district court's ruling.

## I. FACTS AND PRIOR PROCEEDINGS

Congress enacted the Cape Cod National Seashore Act ("the Seashore Act") in 1961, establishing the Seashore as part of the National Park System. The Seashore includes 48 miles of ocean front and bayside beaches, encompassing land and water within the towns of Chatham, Orleans, Eastham, Wellfleet, Truro, and Provincetown. The National Park Service maintains six Seashore beaches and provides facilities for a number of other recreational activities, including boating, fishing, bicycling, and horseback riding.

At the time the Seashore Act was enacted, limited ORV use existed on the Seashore. The National Park Service began to regulate such use in 1964, as the Seashore started to become one of the major ORV recreational areas in New England. By 1974, many miles of ORV trails covered the Seashore. In that year, the Park Service contracted with the University of Massachusetts to conduct a study ("the U.Mass. Study") on the effects of ORV use on the Seashore's ecosystems.[2] The results of the five-year study were published in thirteen

volumes, and documented certain adverse ecological effects resulting from ORV travel on the Seashore.[3]

In response to the findings of the U.Mass.Study, the National Park Service promulgated new regulations ("the 1981 Plan") restricting ORV use on the Seashore.[4] Under the 1981 Plan, all tidal flats and salt marshes were closed to ORV travel. All upland areas and dune trails were also closed, except for an access route to be used by commercial dune taxis and cottage residents, and an emergency bypass route. Other significant restrictions were also created. Following adoption of the 1981 Plan, ORV travel on the Seashore decreased considerably.[5]

CLF filed this suit seeking to enjoin implementation of the 1981 Plan, naming as defendants the Secretary of the Interior, the director of the National Park Service, the Acting Regional Director of the National Park Service, and the Superintendant of the Cape Cod National Seashore.[6] CLF argued that the 1981 Plan would cause significant damage to the coastal ecosystem and impermissible conflicts between ORV travel and other recreational activities on the Seashore, in violation of the Seashore Act and Executive Order 11644. The district court denied CLF's request for injunctive relief, but remanded the 1981 Plan to the Secretary for additional findings regarding whether in relation to other protected uses of the Seashore ORV use meets the definition of "appropriate public use" as set forth in the Act.[7] *Conservation*

---

1. The term "off-road vehicles" refers to vehicles that are capable of cross-country travel over natural terrain. These include jeeps, dune buggies, and other four-wheel drive vehicles.

2. Scientists with the National Park Service Cooperative Research Unit at the University of Massachusetts at Amherst conducted the comprehensive study.

3. The conclusions of the U.Mass.Study were published in a report entitled "The Impact of Offroad Vehicles on Coastal Ecosystems in Cape Cod National Seashore: An Overview."

4. The 1981 Plan was adopted by the Park Service on March 27, 1981, after a notice and comment period and two public hearings.

5. ORV use permits issued by the National Park Service dropped 26% during the first year under the 1981 Plan, and dropped an additional 11% by 1984.

6. The Massachusetts Audobon Society and the Sierra Club were also plaintiffs in the district court proceedings. CLF, however, was the only plaintiff to file a timely notice of appeal from the district court's June 28, 1988 decision granting defendants' motion for summary judgment. CLF filed its notice of appeal on July 7, 1988.

7. In ordering the Secretary to consider more carefully the question of whether ORV travel is an appropriate public use of the Seashore, the district court explained:

   [T]he Secretary's analysis must include, but is not limited to a consideration of: 1) the gen-

*Law Foundation of New England, Inc. v. Clark,* 590 F.Supp. 1467, 1489 (D.Mass. 1984) (*"CLF I"*); 16 U.S.C. § 459b–6(b)(1).

On remand, the National Park Service conducted a survey of Seashore visitors to document their reactions to ORV use.[8] The results suggested that only a small number of such visitors oppose ORV use on the Seashore or claim to be displaced by the vehicles. The Park Service also requested and obtained an opinion from the Northeast Regional Solicitor of the Department of the Interior on the statutory requirements for "appropriateness." The Regional Solicitor advised the defendants that ORV use at the Seashore is not an inappropriate public use *per se* within the meaning of 16 U.S.C. § 459b–6(b)(1).

The National Park Service adopted an Amended Management Plan ("the 1985 Plan") in August of 1985 further restricting ORV use at the Seashore.[9] CLF then amended its complaint to challenge the 1985 Plan, and moved for summary judgment on the issue of appropriateness under the Seashore Act. CLF also requested the district court to reconsider its prior order and findings regarding ecological damage. The defendants then moved for summary judgment to uphold the validity of the 1985 Plan.

The district court granted defendants' motion, ruling that the Secretary's decision to adopt the 1985 Plan was not arbitrary, capricious or an abuse of discretion, and therefore must be upheld. The district

court found that ORV use under the 1985 Plan represents an appropriate public use of the Seashore in accordance with Section 7 of the Seashore Act. The court also found that the 1985 Plan "as implemented and enforced, effectively protect[s] the ecology of the Seashore and does not adversely affect the Seashore's natural, scenic and aesthetic values." *Conservation Law Foundation of New England, Inc. v. Hodel,* No. 81–1004, slip op. at 19 (D.Mass. June 28, 1988) (*"CLF II"*). CLF appeals from the district court ruling on both the appropriateness and ecological damage issues.

## II. STANDARD OF REVIEW

The relevant standard of judicial review in the present case is governed by Section 10 of the Administrative Procedure Act ("the APA or Act"), 5 U.S.C. §§ 704 *et seq.* Under Section 10(e)(2)(A) of the APA, this Court must hold unlawful any agency action, findings and conclusions that we find to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law...." 5 U.S.C. § 706(2)(A). If we find instead that a rational basis exists to support the agency's decision, then we cannot disturb that decision. *Bowman Transportation, Inc. v. Arkansas–Best Freight System, Inc.,* 419 U.S. 281, 290, 95 S.Ct. 438, 444, 42 L.Ed.2d 447 (1974). It is well-established that this standard of review is highly deferential, whereby the reviewing court presumes the agency action to be

eral appropriateness of ORV use under the relevant acts and executive orders; 2) the nature and extent of user conflicts within ORV zones established by the Plan, including a more systematic determination of the sentiments of Seashore users regarding ORV's generally and as regulated under the Plan; and 3) the adequacy of the allocation of Seashore beaches between ORV and non-ORV users including a determination of whether ORV-free zones of sufficient size and quality have been provided for under the Plan.
*CLF I,* 590 F.Supp. at 1489. The 1981 Plan was to remain in full force and effect pending the Secretary's inquiry.

**8.** The National Park Service administered the survey during the summer and fall of 1984. Nearly 1,300 visitors were included in the survey.

**9.** The district court explained in its June 28, 1988 Memorandum and Order:

Under the [1985] Plan, ORVs are limited to the ocean beach from the opening of Hatches Harbor around Race Point to High Head and may no longer travel from High Head to Coast Guard Beach. Also, the corridor is no longer open year-round, but is closed during the winter as well as when tides, beach configurations, or bird nesting make the route impassable. Finally, to protect embryonic dunes, the corridor itself has been narrowed, its boundaries located between a point ten feet seaward of the drift line and the berm crest.
*Conservation Law Foundation of New England, Inc. v. Hodel,* No. 81–1004, slip op. at 3 (D.Mass. June 28, 1988).

valid. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); *Pacific States Box & Basket Co. v. White,* 296 U.S. 176, 185–86, 56 S.Ct. 159, 163–64, 82 L.Ed. 138 (1935); *Ethyl Corp. v. Environmental Protection Agency,* 541 F.2d 1, 34 (D.C. Cir.), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976).

It is important to note that this Court cannot substitute its own judgment for that of the agency. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. at 416, 91 S.Ct. at 823–24. Rather, we are required to affirm the agency's decision if it is supported by a rational basis. *Bowman Transportation, Inc. v. Arkansas–Best Freight System, Inc.,* 419 U.S. at 290, 95 S.Ct. at 444. We cannot base our decision on what we would decide sitting in the place of the agency, but must determine whether the agency's decision can withstand the arbitrary and capricious challenge on review. We emphasize that though this standard of review is a deferential one, it does not mean that the appellate process is merely superfluous. As the reviewing court, we must be assured that the agency decision was based on relevant factors, and we must make "substantial inquiry" into the facts. *Ethyl Corp. v. Environmental Protection Agency,* 541 F.2d at 34–35 (quoting *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. at 415, 91 S.Ct. at 823).

III. THE SEASHORE ACT

■ Section 7 of the Seashore Act provides for the development of the Seashore in certain limited circumstances. The statute provides in pertinent part:

*In order that the seashore shall be permanently preserved in its present state, no development or plan for the convenience of visitors shall be undertaken therein which would be incompatible with the preservation of the unique flora and fauna or the physiographic conditions now prevailing or with the preservation of such historic sites and structures as the Secretary may designate: Provided, That the Secretary may provide for the public enjoyment and under-*

standing of the unique natural, historic, and scientific features of Cape Cod within the seashore by establishing such trails, observation points, and exhibits and providing such services as he may deem desirable for such public enjoyment and understanding: *Provided further, That the Secretary may develop for appropriate public uses such portions of the seashore as he deems especially adaptable for camping, swimming, boating, sailing, hunting, fishing, the appreciation of historic sites and structures and natural features of Cape Cod, and other activities of similar nature.*

16 U.S.C. § 459b–6(b)(1) (emphasis added). Under the express language of Section 7, development of the Seashore is permissible where it is ecologically compatible and where it is for an "appropriate" public use. It is crucial to observe, therefore, that despite the "preserved in its present state" language, the statute does not impose a ban on all development of the Seashore.

CLF argues that ORV use under the 1985 Plan violates Section 7 on the basis that such activity is not an "appropriate" public use of the Seashore. The district court held, however, that the Secretary's decision to adopt the 1985 Plan was not arbitrary, capricious, or an abuse of discretion, and therefore must be upheld. We agree. After making substantial inquiry into the facts of this case, we conclude that a rational basis exists to support the Secretary's decision that ORV use under the 1985 Plan is an appropriate public use of the Seashore.

The 1985 Plan was adopted by the National Park Service after the district court remanded this case to the Secretary to consider more thoroughly the question of whether ORV use is an appropriate public use of the Seashore. The district court instructed the Secretary to consider the general appropriateness of ORV use in light of the Seashore Act and Executive Order 11644, the nature and extent of user conflicts caused by ORVs, and the adequacy of allocation of the Seashore between ORV and non-ORV users. The defendants

considered these and other factors on remand and amended the Management Plan to further restrict ORV use.[10] Based on this analysis, and guided by the Regional Solicitor's opinion that ORV use at the Seashore is not an inappropriate public use *per se*, the Secretary found that limited ORV use under the 1985 Plan is consistent with the appropriateness requirement imposed by Section 7 for any development of the Seashore.

CLF argues that the defendants applied the wrong standard in determining whether ORV use is an appropriate public use of the Seashore under Section 7. CLF maintains that the crucial factor the agency must consider is whether the contemplated use would protect the traditional scenic value of the Seashore. Plaintiff seems to argue, moreover, that the "preserved in its present state" language of Section 7 means that the Secretary cannot authorize any development of the Seashore that would alter the scenery from its condition at the time the Seashore Act was enacted. According to this view, because parts of the Seashore may look different now than they did in 1961 due to ORV travel, that activity must be inappropriate *per se* as a public use. Nothing in the plain language of Section 7 or in the relevant legislative history persuades us that the Secretary should be constrained by this interpretation of the statute.

The district court explained in its June 28, 1988 Memorandum and Order granting defendants' motion for summary judgment that the Secretary on remand engaged in a meaningful analysis of the appropriateness issue. *CLF II*, slip op. at 7–15. We agree, and need not repeat the thorough discussion provided by the district court. Before amending the Management Plan, the Secretary considered the factors that the court had set forth in its remand order. In addition and contrary to what plaintiff would have us believe, the Secretary considered

the impact of ORV use on the aesthetic and scenic values of the Seashore. *Amended Record of Decision* at 21–30.[11] Upon consideration of all of these relevant factors, the Secretary determined that ORV use under the 1985 Plan is an appropriate public use of the Seashore. Given the Secretary's careful treatment of the issue on remand and the considerable restrictions placed on ORV use under the 1985 Plan, we cannot say that the Secretary's decision has no rational basis or represents an abuse of discretion.

Accordingly, we affirm the district court in granting defendants' motion for summary judgment on the appropriateness issue under Section 7 of the Seashore Act.

## IV. EXECUTIVE ORDER 11644

Executive Order No. 11644, 37 Fed. Reg. 2877 (1972) ("Use of Off–Road Vehicles on Public Lands"), *as amended by* Executive Order No. 11989, 42 Fed.Reg. 26959 (1977), *both reprinted in note following* 42 U.S.C. § 4321 (1981), provides that ORV use on federal lands must be consistent with "the protection of the resources of the public lands, promotion of the safety of all users of those lands, and minimization of conflicts among the various uses of those lands." E.O. 11644, § 3(a). Section 3(a) of the Order requires that ORV trails be located in areas of the National Park System only "if the respective agency head determines that off-road vehicle use in such locations will not adversely affect their natural, aesthetic, or scenic values." *Id.* § 3(a)(4). Executive Order 11989, the 1977 amendment to Executive Order 11644, further provides that the agency head must,

> whenever he determines that the use of off-road vehicles will cause or is causing considerable adverse effects on the soil, vegetation, wildlife habitat or cultural or historic resources of particular areas or

---

**10.** For a description of limitations imposed under the 1985 Plan, see *supra* note 9.

**11.** The Secretary's decision regarding what areas would be left open to ORV use under the 1985 Plan was influenced by the agency's attempt to minimize the effects of ORV use on the

scenic values of the Seashore. This influence is evidenced by the "Scenic and Aesthetic Values" discussion in the *Amended Record of Decision*, and the actual location of ORV trails and areas under the 1985 Plan.

trails of the public lands, immediately close such areas or trails to the type of off-road vehicle causing such effects until such time as he determines that such adverse effects have been eliminated and that measures have been implemented to prevent future recurrence.

E.O. 11644 § 9(a). These provisions, then, restrict the Secretary's discretion regarding ORV use on the Seashore, along with Section 7 of the Seashore Act.[12]

■ CLF maintains that Executive Order 11644 requires the defendants to close the Seashore to ORV use because of alleged ecological damage and aesthetic degradation at the Seashore. CLF challenges the Secretary's finding that current regulations on ORV use effectively protect the ecology of the Seashore and that limited ORV use does not adversely affect natural or scenic values at the Seashore. The plaintiff argues in particular that numerous violations of the National Park Service regulations cause considerable damage to the Seashore ecology and aesthetics, and require that a ban be imposed on ORV travel, unless the violations can be prevented.

The Secretary determined that limited ORV use under the 1985 Plan does not adversely affect natural, aesthetic or scenic values at the Seashore. *Amended Record of Decision* at 30. We agree with the district court that there is adequate support for this determination. The defendants considered the protection of natural values in arriving at the current regulations restricting ORV use on the Seashore.[13] The extent and location of ORV trails were set under the 1985 Plan consistent with these values. Though unregulated ORV travel on the Seashore might well

threaten the natural or scenic values of the Seashore, the restrictions imposed under the 1985 Plan are substantial and were designed specifically to protect those values that would otherwise be at risk.

■ The Secretary also determined that ORV use has caused no significant ecological damage at the Seashore since the adoption of the 1981 Plan. The district court correctly explained in its June 27, 1984 decision that an agency's technical conclusions are to be upheld by a reviewing court where they are "founded on supportable data and methodology, and meet minimum standards of rationality." *CLF I,* 590 F.Supp. at 1483 (quoting *South Terminal Corp. v. Environmental Protection Agency,* 504 F.2d 646, 655 & 665 (1st Cir.1974)). We agree with the district court that the defendants' conclusion regarding effective protection of the Seashore ecology under the Management Plan is based on supportable data and methodology, and meets minimum standards of rationality. Accordingly, the defendants' finding as to adequate ecological protection should not be disturbed.

It may be true, as CLF points out, that ORVs caused certain adverse effects at the Seashore prior to the adoption of the 1981 Plan. Those effects were addressed in the U.Mass.Study. What is at issue, however, is whether any significant ecological damage has occurred under the regulations that have been adopted and enforced since that time.[14] Persuasive expert testimony submitted by the government supports its position that restrictions imposed originally under the 1981 Plan and then supplemented by the 1985 Plan have created effective protection of the Seashore ecology.[15] The

---

12. The district court determined that Executive Order 11644, as amended by Executive Order 11989, has the force and effect of law and is enforceable by CLF under APA review. *CLF I,* 590 F.Supp. at 1478.

13. *See supra* note 11.

14. The district court concluded that the restrictions on ORV use under the 1981 Plan demonstrated careful attention to the U.Mass.Study and that the Plan was generally faithful to that study. *CLF I,* 590 F.Supp. at 1480–81.

15. For example, the Affidavit of Dr. James R. Allen provides:

During my visits to the Seashore I have observed that the vast majority of ORV users comply with the management plan. Moreover, it is my opinion that ORV induced geomorphic impact on the beach is superficial and is overwhelmed (by several orders of magnitude) by the natural variability of the highly dynamic beaches at Race Point.

Allen's Affidavit at ¶ 11. Dr. Allen's testimony points out serious deficiencies with the conclu-

closure of the dune trails under the 1981 Plan, moreover, caused a significant decline in ORV use of the Seashore. In addition, the National Park Service has added a number of rangers to improve patrol of the Seashore.[16] Finally, with the adoption of the 1985 Plan the government placed greater restrictions on ORV use of the Seashore. Though some ecological damage to the Seashore may have occurred prior to adoption of the 1981 Plan, we believe sufficient evidence exists to support defendants' conclusion that ORV use has caused no significant ecological damage at the Seashore since that time. We therefore affirm the district court on the issue of ecological protection under the 1981 and 1985 Plans.

## V. CONCLUSION

A rational basis exists to support the defendants' conclusion that ORV use under the 1985 Plan represents an appropriate public use of the Seashore. We cannot say, therefore, that present ORV use of the Seashore violates Section 7 of the Seashore Act. Furthermore, the defendants' finding that current regulations restricting ORV use effectively protect the ecology of the Seashore is based on supportable data and methodology. That determination, therefore, cannot be disturbed.

AFFIRMED.

BREYER, Circuit Judge (concurring).

I agree with the panel that, given the statute's *proviso,* one cannot reasonably read it as imposing an absolute ban on ORVs, particularly since many fishermen and campers like to use them. I also agree with the panel's opinion; we cannot now say that the Interior Department's regulations are "arbitrary, capricious" or an "abuse of discretion." 5 U.S.C. § 706(2)(A). I add only that this latter question is quite a close one. The Conservation Law Foundation, in its brief, notes that recreational "vehicles are used by less than 2.5 percent of the summertime visi-

tors to the Seashore." The government, in its brief, says that it has set aside 8 miles, of 48 Cape Cod National Seashore beachfront miles, or 16 percent of the beach, for ORV use. Although it seems fairly obvious that those who use ORVs need a length of coastline in which to use them, it is also fairly obvious that their use is often incompatible with the quiet enjoyment of the seashore that the Cape Cod National Seashore Act contemplated the vast majority of visitors would seek. At some geographical point, reserving miles of coastline for ORVs would amount to taking too much from too many for the enjoyment of too few. We here hold only that, giving full and appropriate weight to the judgment of the administrators, we cannot say, on the basis of the record before us, that 16 percent actually crosses the line marked by the statutory word "arbitrary."

---

sions reached by CLF regarding the extent of current violations of ORV regulations at the Seashore and the damage allegedly caused by those violations. Allen's Affidavit at ¶¶ 5–11.

**16.** The government mentions in its brief that the Park Service has increased its staff from 23 to 31 rangers since the adoption of the 1981 Plan. Brief for the Defendants–Appellees at 43.