**PHOENIX–GRIFFIN GROUP II, LTD., Gatsby Housing Associates, Inc., Plaintiffs,**

v.

**Elaine L. CHAO, Secretary of the United States Department of Labor, and Tammy D. McCutchen, individually and in her official capacity as Administrator of the Wage and Hour Division of the United States Department of Labor, Defendants.**

No. 95–054–L.

United States District Court, D. Rhode Island.

July 14, 2005.

Alden C. Harrington, Esq., Providence, RI, for Plaintiff.

Michael P. Iannotti, Esq., U.S. Attorney's Office, Providence, RI, for Defendant.

## DECISION AND ORDER

LAGUEUX, Senior District Judge.

This case is before the Court on Defendants' Motion for Summary Judgment, requesting that this Court summarily affirm the determination of the Administrative Review Board of the United States Department of Labor, Case Numbers 00–032 and 00–033, issued on May 30, 2003.[1] Plaintiffs, in turn, have moved for Further Relief and Review, seeking reversal of the Administrative Review Board's decision.

### Parties and Background

In January 1990, Plaintiff developer Phoenix–Griffin Group II, Ltd. (hereinafter "Phoenix–Griffin") entered into a contract with the Providence Housing Authority (hereinafter "PHA") under the terms of which Phoenix–Griffin agreed to construct 92 units of low-income housing in Providence, Rhode Island, for a scattered-site housing project called the Turnkey Project. The Turnkey Project was funded by the United States Department of Housing and Urban Development ("HUD"), pursuant to the Housing Act of 1937, 42 U.S.C. § 1437 et seq.

Phoenix–Griffin contracted with Plaintiff prime contractor LTG Construction Company, Inc., (hereinafter "LTG") to build the units, and LTG contracted with Plaintiff Gatsby Housing Associates to clean the units prior to their tender to the Housing Authority. Lloyd T. Griffin was the president of Phoenix–Griffin, LTG and Gatsby Housing Associates and, until his death in November 1999, was also a plaintiff in this lawsuit. These entities will be referred to collectively as "Plaintiffs" in this decision.

In November of 1990, the Wage and Hour Division of the Department of Labor instituted an investigation into possible wage violations on the Turnkey Project. In March 1991, on the completion of that investigation, the Wage and Hour Division determined that Plaintiffs had willfully violated the Department of Labor's wage provisions, and ordered that HUD withhold $500,000 from the Project's funds. At that time, fifty-two of the housing units had been completed and conveyed to the PHA. Thirty-five additional units were nearly completed, and work on five more had just commenced. With no funds to continue construction on the project, Plaintiffs were forced to shut down the operation, and never resumed work on the Turnkey Project. This lawsuit, including its procedural forebears, ensued.

### The Davis–Bacon Act and other statutory wage provisions

The Davis–Bacon Act, 40 U.S.C. § 3141 et seq. (formerly § 276a), enacted by Congress in 1931, requires that workers on government construction projects be paid wages in accordance with prevailing wage rates determined by the Secretary of Labor. Prevailing wage rates are the prevalent rates for similar work in the same locality. The Act requires that contracts covering government-funded work "shall contain a stipulation that the contractor or

---

**1.** This case is captioned *Lloyd T. Griffin, et al., v. Secretary of Labor.* The Westlaw citation for this decision is 2003 WL 21269140 (DOL Adm. Rev. Bd).

his subcontractor shall pay mechanics and laborers employed directly upon the site of the work [the prevailing wage]." *Building & Constr. Trades Dept. v. Dept. of Labor,* 932 F.2d 985, 987 (D.C.Cir.1991). The United States Supreme Court explained the purpose of the Davis–Bacon Act: "The language of the Act and its legislative history plainly show that it was not enacted to benefit contractors, but rather to protect their employees from substandard earnings by fixing a floor under wages on Government projects." *United States v. Binghamton Const. Co.,* 347 U.S. 171, 176–177, 74 S.Ct. 438, 98 L.Ed. 594 (1954).

Since the enactment of the Davis–Bacon Act, several related acts have addressed government contracts in specific areas, such as the Federal–Aid Highway Act, 23 U.S.C. § 101. The Housing Act of 1937, 42 U.S.C. § 1437 *et seq.,* ("the Housing Act"), is another Davis–Bacon Related Act ("DBRA"), incorporating, *inter alia,* the prevailing wage requirements. Expanding on the "site of the work" language found in the Davis–Bacon Act, the Housing Act requires that government-funded contracts contain a provision guaranteeing that not less than the prevailing wage be "paid to all laborers and mechanics employed in the development of the project ..." 42 U.S.C. 1437j (1994).

Pursuant to the authority granted to it by Congress through the Reorganization Plan No. 14 of 1950 (5 U.S.C.App.), the Department of Labor has promulgated regulations designed to interpret and enforce the terms of the Davis–Bacon Act. *See* 29 C.F.R. § 5. The Reorganization Plan No. 14 of 1950, while granting the Department of Labor the authority "to prescribe appropriate standards, regulations, and procedures," also charges the various federal agencies with overseeing compliance with the regulations when those agencies enter into contracts. In accordance with this responsibility,

HUD—no doubt in an effort to simplify the regulatory thicket for contractors—published its own handbook, "Federal Labor Standards Compliance in Housing and Community Development Programs Handbook," 1344.1 Rev. 1 (1986), (hereinafter "HUD Handbook"). The standards outlined in the HUD Handbook limit the scope of the wage provisions, following more closely the "site of the work" language from the Davis–Bacon Act and the regulations encoded in 29 C.F.R. § 5, and allowing for more narrow coverage than the Housing Act's "all laborers ... employed in the development of the project."

This Court has already determined, and the parties agree, that the terms of the Housing Act govern the prevailing wage issues on the Turnkey Project. However, whether the terms of the Housing Act should be interpreted according to the Department of Labor's broad interpretation, or according to the HUD Handbook's more limited scope, has been a major focus of the litigation, and will be addressed further herein.

### Factual background

There have been three categories of workers whose wages were in dispute. These include the employees of Gatsby Housing Associates, cleaning personnel who cleaned the housing units prior to their tender to the Housing Authority. Plaintiffs have dropped their request for review on this issue and have authorized the release of $12,263.59 in funds to the Wage and Hour Administrator for distribution to the Gatsby employees. Consequently, this category of workers, though a live issue throughout much of the litigation, will not be addressed in detail in this opinion.

A second category of workers is the so-called working subcontractors. The issue concerning these workers, who performed construction work at the various sites, is

whether they were employees of LTG, in which case they should receive the prevailing wage, or whether they were bona fide independent contractors, i.e., owners of a construction business, in which case, under some interpretations, they are exempt from the prevailing wage coverage. The HUD Handbook, at section 7.3, sets forth indicia for identifying bona fide contractors, such as a registered trade name, a separate phone listing, liability insurance or a subcontractor's bond. The Handbook goes on to warn that, "Contractual relationships between contractors and alleged subcontractors (who perform mechanic's work) which are formed for the purpose of evading the application of prevailing wage requirements are expressly prohibited and may provide a basis for debarment." HUD Handbook § 7.3.

In contrast, the regulations promulgated by the Department of Labor state that any laborer or mechanic on a Davis–Bacon covered project "is *employed* regardless of any contractual relationship alleged to exist between the contractor and such person." *Griffin v. Reich*, 956 F.Supp. 98, 105 n. 7 (D.R.I.1997), citing 29 C.F.R. § 5.2(*o*). The Wage and Hour Division, in accordance with the Department of Labor interpretation, determined that Phoenix–Griffin had committed wage violations by failing to pay these workers the prevailing wage.

The third category of workers, whose wages constitute the majority of the disputed funds, are LTG employees who worked at a small plant, fabricating modular housing panels that were then installed on foundations at the scattered sites. The plant was located at 388 Veazie Street in Providence, adjacent to some of the building site lots, on property that Lloyd Griffin had contracted to purchase. (The sale was never completed.) Prior to entering into the contract with PHA, Plaintiffs sought guidance from HUD as to whether these workers would be subject to the prevailing wage provisions. With the backdrop of shifting interpretations of Davis–Bacon's "site of the work" language which has taken place in courts around the country, it was unclear what actually constituted the site of the work for a scattered site housing project. On the other hand, under the Housing Act, these workers were certainly "employed in the development of the project" and so might be covered by the wage provisions.

When it received Plaintiffs' inquiry, PHA sent a letter to the manager of HUD's Providence office, asking for confirmation of their understanding that the Veazie Street workers would not be subject to prevailing wage requirements. Michael J. Dziok, the Director of Housing Management, replied on September 19, 1989:

> In response to your letter dated September 15, 1989, Davis Bacon Wage Rates do not apply to the fabrication of building components unless conducted in connection with and at the site of the project, or in a temporary plant set up elsewhere to supply the needs of the project and dedicated exclusively, or nearly so, to the performance of the contract or project.

This response follows closely the language of the HUD Handbook, which states:

> The precutting of parts and/or the prefabrication of assemblies are not covered unless conducted in connection with and at the site of the project, or in a temporary plant set up elsewhere to supply the needs of the project and dedicated exclusively, or nearly so, to performance of the contract or project.

HUD Handbook § 7.12.

Phoenix–Griffin proceeded to sign the contract with PHA, establish the fabricating plant and hire workers to make the panels at Veazie Street, paying them less than the prevailing wage. The Wage and

Hour Administrator, following its investigation, determined that these workers should have received the prevailing wage and are due approximately $250,000 in back pay.

## Procedural history

Following the Department of Labor's order withholding $500,000 of HUD money in the spring of 1991, Plaintiffs' first move was to file suit in the United States District Court for the District of Rhode Island seeking to enjoin its enforcement. In an effort to allow the Turnkey Project to continue, Judge Raymond J. Pettine of this Court ordered HUD to pay Plaintiffs the $500,000 and then held HUD in contempt for its failure to comply. *Project B.A.S.I.C. v. Kemp*, 768 F.Supp. 21 (D.R.I. 1991). However, the First Circuit reversed the contempt order. *Project B.A.S.I.C. v. Kemp*, 947 F.2d 11 (1st Cir. 1991). The money was not released to Plaintiffs, and work did not resume on the Project.

In August 1991, the Wage and Hour Division issued findings of additional violations committed by Plaintiffs, and ordered their debarment from government contracts for a period of three years. These additional violations, which included intentional actions such as falsified payroll records, were characterized by the Wage and Hour Division as "willful or aggravated."

Plaintiffs sought a hearing before an Administrative Law Judge to challenge the Wage and Hour Division's findings. Following a twenty-four day hearing, Administrative Law Judge David DiNardi issued a decision on July 1, 1993, upholding the determination of the Wage and Hour Division in every respect, including the three-year debarment.[2] This decision was then affirmed in its entirety in December 1994 by the Wage Appeals Board, the appellate administrative board.[3]

Plaintiffs sought judicial review of the Wage Appeals Board's decision in this Court, pursuant to the Administrative Procedure Act, 5 U.S.C. § 701 (1994) *et seq.* Defendants, in turn, moved for summary judgment. *See Griffin v. Reich*, 956 F.Supp. 98 (D.R.I.1997).

### Griffin v. Reich

Plaintiffs argued before this Court that the standards published in the HUD Handbook should control wage requirements on the Turnkey Project, because HUD had led them to believe that those standards were reliable statements of the law. Moreover, Plaintiffs argued, the Department of Labor's interpretation of prevailing wage provisions had been called into question when the D.C. Circuit Court found the regulations at 29 C.F.R. § 5.2(*l*)(2) to be in conflict with the terms of the Davis–Bacon Act. *See Ball, Ball & Brosamer, Inc. v. Reich*, 24 F.3d 1447 (D.C.Cir.1994).

This Court, however, deferred to the wisdom of the Supreme Court as expressed in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), which states that interpretations of an agency concerning statutes it administers are entitled to extreme deference. This Court wrote, "Under *Chevron*, a court may alter an agency interpretation only if it contravenes clear Congressional intent or, if the statute is 'silent or ambiguous,' and the interpretation is not 'based on a permissible construction of the statute.'" *Griffin v. Reich*, 956 F.Supp. at 105. Con-

---

**2.** The decision of the ALJ is identified as Cases Nos: 91–DBA–64/89/90/91/92, 91–DBA–93/94/95, 92–DBA–29/30/31/32.

**3.** The decision of the Wage Appeals Board is marked WAB Case No. 93–15, and can be found on Westlaw at 1994 WL 764105 (DOL W.A.B.).

sequently, this Court has previously acknowledged that in this case "the Department of Labor is the final arbiter of the Housing Act's interpretation with respect to Davis–Bacon coverage." *Id.* at 105.

The Department of Labor's interpretation of the Housing Act's wage provisions follows the statute's clear language that all laborers and mechanics "employed in the development of the project" must be paid the prevailing wage. 42 U.S.C. § 1437j. The Housing Act defines "development" as "any or all undertakings necessary for . . . construction . . . in connection with a low-income housing project." 42 U.S.C. § 1437a(c)(1) (1994). This interpretation, therefore, is the law of the case, and points clearly to the conclusion that all workers employed by Plaintiffs on the Turnkey Project should have been paid the prevailing wage.

However, in *Griffin v. Reich*, this Court also recognized that Plaintiffs had been the victims of a "bureaucratic whipsaw" created by the differing advice they received from HUD, through its officials and its Handbook, and the interpretation of the Housing Act later imposed by the Wage and Hour Division of the Department of Labor. Although the doctrine of equitable estoppel is not frequently applied against the government, and its application had been summarily rejected by the Administrative Law Judge and the Wage Appeals Board, this Court suggested that it might be appropriate in this particular situation:

> . . . [I]n the present case, the regulatory and statutory scheme expressly contemplates that HUD, the contracting agency, has authority to monitor compliance with labor standards provisions. Indeed, HUD signed the contract between PHA and PGG [Phoenix–Griffin] and was responsible for the continued supervision of the Turnkey Project. In short, this Court opines that if ever there was

a case where equitable estoppel should explicitly apply against the government, this is it, provided the factual predicates are found to exist.

956 F.Supp. at 108.

Consequently, this Court stayed Plaintiffs' debarment and retained jurisdiction of the case, but remanded it to the Department of Labor for further consideration and findings. Specifically, this Court ordered the agency's adjudicator to review all predicate facts relevant to the application of equitable estoppel, in order to determine whether HUD's representations constituted affirmative misconduct, whether Plaintiffs relied on HUD's guidance and complied with it, and if that reliance was reasonable. 956 F.Supp. at 107, citing *Akbarin v. INS*, 669 F.2d 839 (1st Cir.1982). A finding of affirmative misconduct on the part of HUD, along with reasonable reliance on the part of Plaintiffs, would operate to preclude—or estop—the Wage and Hour Administrator from enforcing the otherwise applicable wage provisions on the Turnkey Project.

### Subsequent administrative review

Following the remand, the Building and Construction Trades Department of the AFL–CIO was permitted to intervene as an interested party. On December 7, 1999, a second Administrative Law Judge issued an opinion in this case.[4] Judge DiNardi ordered the case reassigned to another administrative law judge after denying Plaintiffs' motion that he recuse himself.

Two days of testimony, as well as additional documentary evidence, was presented to Administrative Law Judge Daniel F. Sutton in November 1998. Judge Sutton noted that Judge DiNardi's findings of fact were, with few exceptions, undisturbed by this Court and now represented the law of the case. Therefore, Judge Sutton con-

---

4. This case is identified as ARB Case No.: 1988–028, ALJ Case No.: 1991–DBA–00094.

fined his inquiry to an examination of "whether the Respondents reasonably relied on affirmative misrepresentations by HUD and whether the Respondents, in fact, complied with HUD's policies." Slip opinion at p. 7.

The ALJ determined that Plaintiffs had failed to comply with the HUD Handbook in paying the working subcontractors and the cleaning personnel, and that, consequently, equitable estoppel was not available to them in connection with these categories of workers. Based on these conclusions, and the affirmation of Judge DiNardi's finding that Plaintiffs "engaged in a pattern of activity to evade the DBRA by various schemes," Judge Sutton upheld the debarment penalty as well. Slip op. at p. 27.

However, in his re-examination of the payment issues concerning the workers at the Veazie Street fabrication plant, Judge Sutton determined that the Department of Labor was estopped from finding Plaintiffs in violation of the wage provisions, based on the guidance given to Plaintiffs from HUD officials and the guidelines set forth in the HUD Handbook.

Plaintiffs had been instructed by HUD that it need not pay the prevailing wage to the workers creating pre-fabricated panels, "unless conducted in connection with and at the site of the project, or in a temporary plant set up elsewhere to supply the needs of the project and dedicated exclusively, or nearly so, to the performance of the contract or project." Judge Sutton determined that this statement of the law, found in both the letter from a HUD official and the HUD Handbook, was an affirmative misstatement. Furthermore, Judge Sutton found that Plaintiffs had reasonably relied on the statement and had set up the Veazie Street plant in such a way as to comply with this exception:

> Evidence introduced at the first hearing and at the hearing on remand shows that Mr. Griffin created the Veazie Street plant with the intention of supplying prefabricated building panels for use in housing construction projects throughout the Providence area, including Phase 1 of the Turnkey Project, a second planned phase of the Turnkey Project as well as another scattered site housing project known as Barbara Jordan III. Indeed, Mr. Griffin's envisioned use of the plant extended beyond the efficient production of building components; he recruited and hired chronically unemployed or underemployed people, as well as individuals with societal problems, for training and work. The Veazie Street plant has been also been used for other activities, such as the fabrication of cabinets, door frames and other materials for maintenance and repairs on Barbara Jordan I and II, completed housing projects now under Phoenix–Griffin's management; and the facility continued in operation as of the date of the hearing on remand. However, the only housing panels fabricated at the Veazie Street facility to date were those used in the Turnkey Project.

Slip op. at p. 8, (citations to the record omitted). Based on this analysis, the ALJ concluded that the Department of Labor was estopped from prosecuting Plaintiffs for violations of the wage provisions at the Veazie Street plant. As stated above, Judge Sutton determined that violations of wage provisions had taken place in connection with the working subcontractors and the cleaning personnel, and as a result, the debarment was reinstated.

The Administrator for the Department of Labor, the Phoenix–Griffin Plaintiffs, and the Building and Construction Trades Department of the AFL–CIO all filed Petitions for Review, and the dispute was sent to the Administrative Review Board of the Department of Labor (formerly constituted as the Wage Appeals Board).

The Administrative Review Board ("ARB") issued its decision on May 30, 2003.[5] It affirmed the decision of Administrative Law Judge Sutton on the issues of the working subcontractors, the cleaning personnel and the debarment, but reversed on the issue of the Veazie Street fabrication plant workers, holding that these workers were also entitled to the prevailing wage.

On the issue of the working subcontractors, the Administrator for the Department of Labor reiterated its argument that the Wage and Hour Division considered even bona fide subcontractors to be covered by the prevailing wage provisions when performing Davis–Bacon covered work on a Davis–Bacon covered project. Slip op. at p. 5. As for the equitable estoppel issue, the Administrator argued that Plaintiffs failed to show that they had relied on the HUD Handbook guidelines, or that this reliance had led them to violate the wage provisions. The ARB concurred that estoppel was not available to Plaintiffs on the issue of payment to the working subcontractors.

The ARB cited the findings of the first ALJ that, "Mr. Griffin knew the purported subcontractors were not bona fide and, of course, that the 'subcontractors' did not have any of the HUD-required proof to document status as legitimate subcontractors. Further … Mr. Griffin participated in a scheme to avoid payment of prevailing rates to the fraudulent subcontractors and encouraged the preparation and submission of false certified payrolls to HUD to conceal the underpayments." Slip op. at p. 6.

Over Plaintiffs' objections, the ARB stated that its review of the entire administrative record showed that the pertinent facts found by the first ALJ "were properly and adequately based on the evidence of record and the second ALJ was correct in adopting these facts." Slip op. at p. 7.

The ARB likewise determined that the defense of equitable estoppel was unavailable to Plaintiffs in connection with its payments to the cleaners employed by Gatsby Housing Associates. Although Plaintiffs had tried to argue that the cleaning work was post-construction and therefore, pursuant to the HUD Handbook, not covered by the prevailing wage provision, the ARB cited the first ALJ's findings that Griffin's testimony at the hearing on this issue was not credible. In contrast, the testimony of one of the cleaners who stated that he performed construction-related tasks, such as scraping tile adhesive from floors and laying grass, was credible and persuaded the ALJ, and the ARB in turn, that the cleaners should be paid the prevailing wage. As explained earlier in this opinion, Plaintiffs have since conceded this point.

Between the filing of the petitions for review and the ARB's deliberations, the Board was notified of the death of Lloyd Griffin. Acknowledging that all plaintiff corporations served as Griffin's alter egos, the Administrator dropped its claim for debarment, and the ARB vacated the previous debarment orders.

Both the Administrator and the Building and Trades Division of the AFL–CIO filed petitions for review of ALJ Sutton's determination that the Administrator was estopped from enforcing the wage provisions on behalf of the Veazie Street fabrication plant employees.

The Administrator argued before the ARB that HUD did not induce Plaintiffs to

---

5. This decision is designated as ARB Case Nos., 00–032, 00–033 (formerly ARB No. 98–028); ALJ Case No. 91–DBA–94. It may be found through Westlaw at 2003 WL 21269140 (DOL Adm.Rev.Bd).

violate the Housing Act's wage provisions through the misrepresentations of the law contained in its Handbook. In fact, had Plaintiffs actually complied with the Handbook's guidelines, as well as the other advice offered by HUD, there would have been no violation. The ARB agreed with the Administrator's analysis.

To further illuminate the concepts informing the HUD Handbook, the ARB cited the relevant Department of Labor regulation which governed off-site fabrication facilities at the time of Turnkey's construction:

> Except as provided in paragraph (*l*)(3) of this section [providing exemption for permanent offsite facilities operated by a covered contractor], fabrication plants, mobile factories, batch plants, borrow pits, job headquarters, tool yards, etc., are part of the site of the work provided they are dedicated exclusively, or nearly so, to performance of the contract or project, and are so located in proximity to the actual construction location that it would be reasonable to include them.

29 C.F.R. § 5.2(*l*)(2) (1993). Under the terms of this regulatory language, an off-site fabrication facility like the Veazie Street plant would be covered by the prevailing wage regulation as long as its production was dedicated to the Davis–Bacon-covered project it was serving. As the ARB points out, this is essentially the same advice provided to Plaintiffs by HUD, in the Handbook, the September 9, 1989, letter, and a verbal representation made by HUD employee Louis Azar. Griffin testified that when he asked about the Veazie Street plant, Azar looked in the Handbook and told him, "Well, if you want to do this for Turnkey, you have to have more than one project that you are going to service from Veazie Street."

After reviewing the prior administrative proceedings, the ARB concluded "that all of the pertinent record evidence demonstrates beyond doubt that the Veazie Street prefabrication plant exclusively served the scattered site project." Slip op. at p. 11. The ARB continued:

> This single finding of fact alone should have served as an absolute bar to the ALJ's conclusion of law on remand that Griffin committed the Veazie Street violations as the result of relying on misleading HUD advice. The ALJ's reasoning on remand improperly focused on Griffin's intent to supply prefabricated panels to other endeavors and also on certain HUD regional office workers' knowledge of Griffin's intent. Mr. Griffin's intent and HUD's knowledge of his intent are simply not legally relevant. *See United Constr. Co., Inc.,* WAB No. 82–10, slip op. at 8–9 (Jan. 14, 1983) (actual, rather than intended, use of off-site asphalt batch plant determinative of DBA coverage). Griffin's failure to actually supply other projects or buyers meant that he failed to comply with any of the three pieces of HUD advice.

Slip op. at p. 12.

Just as the ARB dismissed Phoenix–Griffin's intended plans for the fabrication plant, it also dismissed the evidence that Phoenix–Griffin's bid was based on labor costs below the prevailing wage:

> ... the purported basis for Griffin's bid is not relevant. It is relevant that HUD advised Griffin that the Veazie Street panel fabrication plant could be exempt if not used solely for scattered sites project. Griffin's failure to meet this HUD criterion caused the violations, in retrospect rendering its purported "basis" a bad business decision in light of its subsequent failure to follow the HUD advice.

Slip op. at p. 13.

Consequently, the matter returns to this Court. Plaintiffs have filed a Motion for

Further Relief and Review, and Defendants have filed a motion for summary judgment, seeking to have the decision of the ARB affirmed.

### Standard of review

The matter reaches this Court on Plaintiffs' petition for review of the final determination of the Secretary of Labor, through her Administrative Review Board, pursuant to the Administrative Procedure Act, 5 U.S.C. § 706. The Act authorizes the reviewing court to decide questions of law and interpret statutory provisions. However, the reviewing court may set aside an agency action, including its findings and conclusions, only if they are found to be:

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional rights, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706. Elaborating on these standards, the United States Supreme Court has written that "de novo review is appropriate only where there are inadequate factfinding procedures in an adjudicatory proceeding ..." *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). Otherwise, the "arbitrary and capricious" language from § 706(2)(A) provides the standard.

In applying that standard, the focal point for judicial review should be the administrative records already in existence, not some new record made initially in the reviewing court.

411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106.

Under this narrow standard, the Supreme Court has instructed further, a reviewing court may not set aside an agency ruling that is rational, based on consideration of the relevant factors, and within the scope of the authority delegated to the agency by the statute. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). The United States Court of Appeals for the First Circuit described the standard as follows: "It is well established that this standard of review is highly deferential, whereby the reviewing court presumes the agency action to be valid." *Conservation Law Foundation, Inc. v. Secretary of Interior*, 864 F.2d 954, 957–958 (1st Cir.1989).

While Plaintiffs have moved for review of the agency ruling, Defendants have moved for summary judgment. Their memorandum states that it is also in opposition to Plaintiffs' Motion for Further Relief and Review, which Defendants have treated as a motion for summary judgment. When ruling on a motion for summary judgment, the court must look to the record and view all the facts and inferences therefrom in the light most favorable to the nonmoving party. *Continental Casualty Co. v. Canadian Universal Ins. Co.*, 924 F.2d 370, 373 (1st Cir.1991). Once this is complete, Rule 56(c) requires that summary judgment be granted if there is no issue as to any material fact and the moving party is entitled to judgment as a matter of law. To win summary judgment, the moving party must show that "there is an absence of evidence to support" the non-moving party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106

S.Ct. 2548, 91 L.Ed.2d 265 (1986). In response, the nonmoving party cannot rest on its pleadings, but must "set forth specific facts demonstrating that there is a genuine issue for trial" as to the claim that is the subject of the summary judgment motion. *Oliver v. Digital Equipment Corp.,* 846 F.2d 103, 105 (1st Cir.1988).

■ This approach is not appropriate for the review of a final agency action. According to the standard set forth by the Administrative Procedure Act, the Court must defer to the factfinding of the Administrative Review Board, "unless 'the record evidence would compel a reasonable factfinder to make a contrary determination.'" *Guzman v. INS,* 327 F.3d 11, 15 (1st Cir. 2003), quoting from *Aguilar–Solis v. INS,* 168 F.3d 565, 569 (1st Cir.1999). It is not proper for this Court to view the facts in a light favorable to the nonmoving party.

The United States District Court for the District of Colorado addressed this issue in *Lodge Tower Condominium Ass'n. v. Lodge Properties,* 880 F.Supp. 1370 (D.Colo.1995), and this Court concurs with its approach:

> ... [A] motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure—especially a motion for partial summary judgment—makes no procedural sense when a district court is asked to undertake judicial review of administrative action. Such a motion is designed to isolate factual issues on which there is no genuine dispute, so that the court can determine what part of the case must be tried to the court or a jury. *Nickol v. United States,* 501 F.2d 1389, 1392 (10th Cir.1974). Agency action, however, is reviewed, not tried. Factual issues have been presented, disputed, and resolved; and the issue is not whether the material facts are disputed, but whether the agency properly dealt with the facts. Only recently, the United States Court of Appeals for the Tenth Circuit has followed *Nickol* and cautioned, "When acting as a court of appeal, it is improper for a district court to use methods and procedures designed for trial." *Olenhouse v. Commodity Credit Corp.,* 42 F.3d 1560, 1564 (10th Cir.1994).

880 F.Supp. 1370, 1374–1375.

In accordance with this approach, this Court will treat Defendants' motion for summary judgment as a petition to affirm the agency action, employing the standard articulated in the Administrative Procedure Act, 5 U.S.C. § 706.

### Analysis

The Court is charged with reviewing the decision of the Administrative Review Board concerning Plaintiffs' alleged violations of the wage provisions of the Housing Act in their payments to two categories of workers employed in building the low-income housing project known as the Turnkey Project. The categories of workers whose wages are, in dispute are the employees of the Veazie Street fabrication plant and the so-called working subcontractors.

### Equitable estoppel

In addition, Defendants, as well as Intervenor Building and Trades Division of the AFL–CIO, seek to have the Court reconsider its earlier holding in *Griffin v. Reich,* 956 F.Supp. 98 (D.R.I.1997), concerning equitable estoppel. In *Griffin v. Reich,* this Court decided to remand the case for factual findings on the issue of whether or not equitable estoppel may lie against the Department of Labor because of the varying representations of the prevailing wage laws provided by HUD and the Wage and Hour Division of the Department of Labor. On remand, the Administrative Review Board ruled that equitable estoppel was not available to Plaintiffs as a defense to the charges of

wage violations in connection with either category of workers. Because this Court herein affirms the decision of the Administrative Review Board, the issue of the applicability of equitable estoppel to this case will not be revisited.

 To assess the viability of an equitable estoppel defense, courts in the First Circuit must review the facts to determine whether there has been "reasonable reliance" on " 'affirmative misconduct' attributable to the sovereign." *Griffin v. Reich,* 956 F.Supp. 98, 107 (D.R.I.1997), *quoting United States v. Ven–Fuel, Inc.,* 758 F.2d 741, 761 (1st Cir.1985). The First Circuit has established a two-part test to aid in the identification of affirmative misconduct: (1) was the government's action error? and (2) did the government's misconduct induce the petitioner to act in a way he or she would not otherwise have acted? *Akbarin v. INS,* 669 F.2d 839, 843 (1st Cir.1982).

### Working subcontractors

 Phoenix–Griffin has maintained that it relied on guidelines set forth in the HUD Handbook in establishing wage rates for the category of construction workers known as the working subcontractors. The operative section of the Handbook, Section 7–3, reads:

> Contractual relationships between contractors and alleged subcontractors (who perform mechanic's work) which are formed for the purpose of evading the application of prevailing wage requirements are expressly prohibited and may provide a basis for debarment. Where there is any doubt as to the bona-fide nature of a self-employed subcontractor who has no other employees, the following must be checked:
>
> 1. Does the subcontractor have a registered trade name and is there a telephone listing under that name?
>
> 2. Does the subcontractor have a license?
>
> 3. Does the subcontractor have liability insurance or a subcontractor's bond?
>
> 4. Federal Tax Identification Number.
>
> Any of these criteria in conjunction with a signed contract containing HUD Federal Labor Standards Provisions from each such subcontractor should be sufficient to establish that he or she is a bona-fide subcontractor. Such a subcontractor will submit payrolls indicating only that he/she is the owner, the hours worked and the classification. The phrase "self-employed owner" shall be written under the name, address, and Social Security Number ... Nonbonafide self employed contractors must be carried as employees on the payroll of the contractor who engaged him/her, and must be paid the prevailing wage rate for the classification of work performed.

To support its determination that the underlying facts are insufficient for Phoenix–Griffin's invocation of equitable estoppel, the Administrative Review Board cites the findings of both administrative law judges. The first ALJ, who conducted a 24–day hearing, found that Lloyd Griffin knew that the subcontractors were not bona fide, and that none had any of the required proof of legitimacy. On remand, the second ALJ found that Griffin had engaged in a scheme to avoid paying the prevailing wage to the purported subcontractors, and that Griffin had encouraged his employees to collude in the scheme by preparing and submitting falsified payroll records to HUD.

Furthermore, the Administrative Review Board determined that the facts found by the first ALJ were "properly and adequately based on the evidence of rec-

ord," and that no evidence was offered in the proceedings on remand that was inconsistent with the initial findings. Slip op. at p. 7.

The Administrative Review Board concluded that Plaintiffs failed to comply with the guidelines set forth in the HUD Handbook, and so cannot claim to have relied upon those guidelines to their detriment. This conclusion is supported by sufficient evidence; it is not arbitrary or capricious, or violative of any law or statute. Consequently, this Court upholds the Administrative Review Board's determination on the subject of the working subcontractors.

### Veazie Street plant workers

■ The remaining issue to be resolved by this Court is the question of whether or not Plaintiffs reasonably relied on the advice from HUD officials and guidelines in the HUD Handbook, and whether or not that reliance induced them to commit violations of the Department of Labor's prevailing wage requirements. In its examination of this issue, the Administrative Review Board first reviewed the Department of Labor's regulation, in effect at the time of the Turnkey Project, that addresses the issue of off-site fabrication plants, 29 C.F.R. § 5.2(*l*)(2) (1993).[6] The language of this regulation is essentially the same as the guidelines set forth in the HUD Handbook, and the advice repeated to Griffin, verbally and by letter, by HUD officials. Citing the ALJ's findings that all the wall panels produced at the Veazie Street plant were used by the Turnkey Project, corroborated by Griffin's own tes-timony that he never once sold or distributed anywhere else, as well as the absence of any evidence to the contrary, the Administrative Review Board stated, "This single finding of fact alone should have served as an absolute bar to the ALJ's conclusion of law on remand that Griffin committed the Veazie Street violations as the result of relying on misleading HUD advice." Slip op. at p. 12. The Court agrees with the Administrative Review Board's reasoning on the issue of the Veazie Street workers.

As the Department of Labor is charged with interpreting and enforcing the requirements of the Davis–Bacon Act, a further look at its regulations is helpful in shedding light on the issue of offsite fabrication plants. The paragraph following the one quoted above in footnote six states:

(3) Not included in the "site of the work" are permanent home offices, branch plant establishments, fabrication plants, and tool yards of a contractor or subcontractor whose locations and continuance in operation are determined wholly without regard to a particular Federal or federally assisted contract or project. In addition, fabrication plants, batch plants, borrow pits, job headquarters, tool yards, etc., of a commercial supplier or material man which are established by a supplier of materials for the project before opening of bids, and not on the project site, are not included in the "site of the work." Such permanent, previously established facilities are

6. The regulation reads: "Except as provided in paragraph (*l*)(3) of this section [providing exemption for permanent offsite facilities operated by a covered contractor], fabrication plants, mobile factories, batch plants, borrow pits, job headquarters, tool yards, etc., are part of the site of the work provided they are dedicated exclusively, or nearly so, to performance of the contract or project, and are so located in proximity to the actual construc-tion location that it would be reasonable to include them." Slip op. at p. 10. (The "reasonable proximity" language from the final phrase of this definition was amended by Congress in 2000 to "adjacent or virtually adjacent to the site of the work," following the Circuit Court of the District of Columbia's decision in *Ball, Ball & Brosamer, Inc. v. Reich*, 24 F.3d 1447 (D.C.Cir.1994)).

not a part of the "site of the work," even where the operations for a period time may be dedicated exclusively, or nearly so, to the performance of a contract. 29 C.F.R. § 5.2(*l*) (1998).

Paragraph (2) of that regulation attempts to describe what kind of offsite facilities are considered part of the "site of the work," and paragraph (3) describes what kinds of offsite facilities are *not* part of the "site of the work." Looking at the two paragraphs together, it seems clear that the Veazie Street fabrication plant is not the kind of "permanent, previously established" facility whose location and operation are determined "wholly without regard to a particular Federal or federally assisted contract or project" that is described in paragraph (3). Employing one's powers of deduction, the fact that the Veazie Street plant does not fit the definition of the offsite plants that are *not* considered "site of the work" buttresses the conclusion that it more closely resembles the kind of plants that *are* part of the site of the work.

The Veazie Street plant was established near the various Turnkey sites, on a site adjacent to sites originally earmarked as building sites, in a building that Griffin contracted to buy at the time he entered into the contract with the PHA. The plant was established in order to make wall panels for the Turnkey Project. The evidence demonstrates that the only wall panels made by the plant were used by Turnkey; it was in fact "dedicated exclusively, or nearly so, to the performance of the contract."

Griffin testified that he intended to continue using the plant to make wall panels for other projects. The credibility of Griffin's best intentions are undermined by the earlier findings that he engaged in willful violations of the prevailing wage laws in connection with other employees. But regardless of the sincerity of his intentions (or lack thereof), his intentions are not controlling. The Administrative Review Board wrote, "Mr. Griffin's intent and HUD's knowledge of his intent are simply not legally relevant. *See United Constr. Co., Inc.*, WAB No. 82–10, slip op. at 8–9 (Jan. 14, 1983). Griffin's failure to actually supply other projects or buyers meant that he failed to comply with any of the three pieces of HUD advice." Slip op. at p. 12.

In a case decided by the Wage Appeals Board in 1985, *Ontario Pipeline, Inc. & Farmington Concrete Products, Inc.*, WAB Cases Nos. 81–12 & 81–13 (January 28, 1985),[7] it was determined that a mobile fabrication facility manufacturing concrete manholes was dedicated exclusively to the project—an EPA—financed sewage system. In its determination, the Wage Appeals Board took into consideration the fact that the facility was established at the onset of the construction project and moved to a different location at the completion of the project. While established near the sewage project, the manufacture sold approximately 93% of its product to the prime contractor, and 6% to another contractor on the same project. The manufacturer testified that it located the plant in the area intending it to be permanent because it anticipated an ongoing demand for its manholes. The plant was relocated only when that business failed to develop. The Board rejected this argument, stating that the manufacturer's intent was not legally relevant.

The Board further supported its decision with evidence that the prime contractor and the manhole manufacturer were owned by one holding company, with at least three common officers. This fact indicated that the manufacturer was not "a

---

**7.** This decision may be found at 1985 WL 167219 (DOL W.A.B.).

bona fide material supplier." Slip op. at p. 4.

In the usual instance, a bona fide material supplier will provide the materials (whether they are pipe, asphalt, concrete mix, gravel, or in this case, manholes) to several contractors at the same time. If this is the supplier's method of operation, he is not considered to be a subcontractor, and, if the contract is federally financed or assisted and is thereby subject to the Davis–Bacon Act labor standards provisions, the supplier's employees are not subject to the prevailing wage rates contained in the applicable wage determination. However, if the supplier does not operate in this manner and it appears from the facts that is devoting all of his supply to one project, he runs the risk of being labelled a subcontractor, and as such, his employees are provided the protection of the labor standards provisions and must be paid the predetermined wages along with the employees of all the other subcontractors and the general contractor on the Federal project.

Slip op. at p. 3.

At the time that the Veazie Street plant was established, and when the Wage and Hour Division conducted its investigation of payment practices there, the Department of Labor had relied for many years on a two-pronged functional and geographic test to analyze offsite temporary plants as described by 29 C.F.R. § 5.2(l). As the language in the regulation in effect at the time is the same as the language in the HUD Handbook, it is worthwhile to examine some of these cases.

In *Mayfair Construction Co. of Douglass, Kansas,* W.A.B. Case No. 81–16 (April 18, 1983),[8] a Titan II missile silo exploded at the McConnell Air Force Base. While some of the rebuilding took place at the Air Force Base, damaged acoustical modules were repaired at Mayfair's warehouse nine miles away, then transported back to the silo for installation. A dispute arose concerning the proper wages to be paid to the warehouse workers.

The Wage Appeals Board held that the warehouse workers were entitled to the prevailing wage, explaining that "functionalism controls the Board's decision on these facts," Slip. Op., p. 4, as the work at the warehouse was performed exclusively for the missile repair project. As for the geographic issue, the Board stated it was not controlling because, "It is apparent that practicality and convenience dictated that the repairs could not be performed in the silo and that this was the nearest location where the work could be performed." Slip op. at p. 3. *See also, Atco Construction, Inc.,* WAB Case No. 86–01 (August 22, 1986).[9]

A common sense review of all the factual circumstances surrounding the Veazie Street plant and its workforce leads to the conclusion that the plant was an integral part of the construction of the Turnkey housing units, not a separate commercial entity. The Veazie Street plant never made any more wall panels after the abrupt termination of the Turnkey Project, and none of the wall panels made there were sold to any other buyer besides LTG. The Veazie Street plant was established and operated by Lloyd Griffin, who was also the principal of Phoenix–Griffin and LTG. According to testimony before the ALJ, Veazie Street employees routinely transported completed wall panels to the housing sites, where they installed the panels on the foundations. In addition, construction workers were sometimes sent

8. 1983 WL 144670 (DOL W.A.B.).

9. 1986 WL 193113 (DOL W.A.B.).

from the housing sites to make wall panels at the fabrication plant.[10]

Moreover, Griffin started the process of purchasing the Veazie Street building when he entered into the contract for the Turnkey Project, but abandoned the plan when the Turnkey Project was terminated. The Veazie Street plant was not a "permanent, previously established" facility "whose location and continuance in operation are determined wholly without regard" to the particular Federal project. 29 C.F.R. § 5.2($l$)(3).

Furthermore, while Griffin may have intended the plant as an independent ongoing operation, for various reasons, this is not what materialized. As stated above, his intent is not controlling when analyzing the applicability of the law. *Ontario Pipeline, Inc. & Farmington Concrete Products, Inc.*, WAB Cases Nos. 81–12 & 81–13, and *United Construction Co., Inc.*, WAB Case No. 82–10.

The findings of Administrative Law Judge DiNardi are important and entitled to great deference. ALJ DiNardi found that Phoenix–Griffin engaged in various schemes that constituted a pattern of activity aimed at evading the wage provisions of the DBRA. One of these schemes involved the workers at the Veazie Street plant, who were paid below the prevailing wage when they worked at Veazie Street because, according to Griffin, they were employees of a separate manufacturing facility. However, when these same employees traveled to the housing sites and worked there, they were treated as independent contractors, and also paid below the prevailing wage. The Veazie Street plant workers also testified that they engaged in other construction tasks, such as laying linoleum, while at the housing sites. It appears incontrovertible that these workers were employees of LTG, engaged in all phases of construction, and that the work performed at the Veazie Street plant was integral to, and dedicated exclusively to, the Turnkey Project.

All of these facts taken together support this Court's determination that the Veazie Street plant establishment does not fit into the fabrication plant exception outlined in the HUD Handbook, and that Plaintiffs accordingly failed to comply with, and therefore did not rely upon, the guidelines provided in the HUD Handbook, and the other advice offered by HUD to Griffin. With the defense of equitable estoppel no longer available to Plaintiffs, the Housing Act, and its wage provisions, control this case and, consequently, the prevailing wage provisions must be applied to the Veazie Street workers.

### Conclusion

Because Plaintiffs failed to comply with the guidelines set forth in the HUD Handbook in connection with either the working subcontractors or the Veazie Street employees, Plaintiffs cannot invoke equitable estoppel as a defense against the Department of Labor's enforcement of the wage provisions of the Housing Act. This Court affirms the conclusions of the Administrative Review Board in *Lloyd T. Griffin, et al. v. Secretary of Labor*, ARB Case Nos. 00–032, 00–033. The Department of Labor is entitled to obtain the back wages withheld by HUD and pay them to the affected workers. The Clerk shall enter judgment for the Defendants, as indicated, forthwith.

It is so ordered.

10. When construction workers from the sites were sent to the plant to help with the wall panels, they were instructed not to reveal their rate of pay to the Veazie Street workers.